William JOHNSON, by his conservator, Richard JOHNSON, on his own behalf and on behalf of all others similarly situated, Plaintiffs-Appellees, Cross-Appellants,

v.

Terry B. BRELJE and Robert Devito, Defendants-Appellants, Cross-Appellees.

Nos. 81–2798, 81–2799, 81–3014.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1982.

Decided Feb. 18, 1983.

Maureen D. Mudron, Dept. of Mental Health/DD Div. of Legal Services, Chicago, Ill., for defendants-appellants, cross-appellees.

Robert C. Gislason, Keck, Mahin & Cate, Chicago, Ill., for plaintiffs-appellees, cross-appellants.

Before WOOD and ESCHBACH, Circuit Judges, and CAMPBELL,* Senior District Judge.

ESCHBACH, Circuit Judge.

This case presents constitutional issues concerning the commitment of Illinois criminal defendants who are found unfit to stand trial ("USTs") and are assigned to the Chester Mental Health Center ("Chester"). The district court held that Illinois's practice of assigning all male USTs to Chester violates procedural rights guaranteed by the due process clause of the Fourteenth Amendment. The district court also determined that USTs at Chester are denied their constitutional rights to meaningful access to the courts. Furthermore, the court held that USTs' liberty interests in freedom to move around the grounds at Chester have been unconstitutionally infringed. We affirm the district court's judgments on these matters and we also agree with the lower court that the plaintiffs are not entitled to monetary damages. We remand the case, however, for recomputation of the amount of reasonable attorneys' fees that the plaintiffs are entitled to receive pursuant to 42 U.S.C. § 1988.

## I. THE SETTING

■ Plaintiff Johnson brought this § 1983 action on behalf of himself and on behalf of the certified class of "all male persons who have been and/or may be hospitalized pursuant to the Illinois Mental Health Code and/or Illinois Code of Corrections after being found unfit to stand trial by an Illinois Court and solely because of said finding are transferred to Chester Mental Health Center."[1] *Johnson v.*

---

1. The named plaintiff, transferred to Chester in 1977, no longer is hospitalized in that facility. No portion of this case, however, is moot. This case belongs to that "narrow class of cases in which the termination of a class representative's claim does not moot the claims of unnamed members of the class." *Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975). The named plaintiff had a case or controversy at the time the complaint was filed and at the time the class action was certified by the district court. There remains a live controversy between the defendants and members of the class; thus Article III's requirement of a case or controversy is satisfied. *See Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1975).

*Brelje,* 482 F.Supp. 121, 123 (1979). The plaintiffs challenged the procedure of automatically assigning all male USTs to Chester,[2] and also contended that certain restrictions imposed on patients in the facility violate the plaintiffs' constitutional rights. Injunctive relief and monetary damages were sought against the defendants—the superintendent of Chester and the director of the Illinois Department of Mental Health and Developmental Disabilities ("DMHDD"). The case was resolved below on cross-motions for summary judgment, with the plaintiffs prevailing on some claims and the defendants prevailing on others. *See* 521 F.Supp. 723 (1981). Subsequently, the plaintiffs moved for and were awarded attorneys' fees. These cross-appeals, challenging the district court's resolution of the case and its order granting attorneys' fees, followed.

## II. PROCEDURAL DUE PROCESS CLAIM

Under Illinois law, a criminal defendant who is found unfit to stand trial because of a mental disability, may be placed by the court in the custody of the DMHDD. *See* Ill.Rev.Stat. ch. 38, § 104–17(b) (1981). In 1977, the DMHDD began the practice of assigning all male USTs to Chester, a maximum security mental health facility significantly more restrictive than some other DMHDD facilities. We agree with the district court that this practice violates the plaintiffs' procedural due process rights.

The Fourteenth Amendment prohibits a state from depriving a person of life, liberty, or property without due process of law. The threshold question in this case, therefore, is whether the automatic assignment of male USTs to Chester, rather than a less restrictive facility, implicates a liberty interest protected by this amendment. *See Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct.

1254, 1260, 63 L.Ed.2d 552 (1980); *Shango v. Jurich,* 681 F.2d 1091, 1097 (7th Cir.1982). To answer this question, we may look to Illinois law to find a state-created liberty interest that is entitled to the protection of the federal due process clause. *See Mills v. Rogers,* —— U.S. ——, 102 S.Ct. 2442, 2449, 73 L.Ed.2d 16 (1982); *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

Section 2–102 of the Illinois Mental Health and Developmental Disabilities Code ("Mental Health Code"), Ill.Rev.Stat. ch. 91½, § 2–102 (1981), states that a "recipient of services shall be provided with adequate and humane care and services *in the least restrictive environment,* pursuant to an individual services plan ...." (emphasis added). Section 1–123 of the Mental Health Code defines "recipient of services" as a person who "is receiving treatment." Because the plaintiffs, USTs, are remanded to the custody of the DMHDD for "treatment," Ill.Rev.Stat. ch. 38, § 104–17(b) (1981), the plaintiffs are recipients of services. Under Illinois law, therefore, they are entitled to treatment "in the least restrictive environment," Ill.Rev.Stat. ch. 91½, § 2–102 (1981). This entitlement is a state-created liberty interest; in deciding whether to assign a UST to the restrictive environment of Chester, rather than to a less restrictive facility, the state must abide by the minimum requirements of procedural due process as defined by federal law. *See Vitek v. Jones,* 445 U.S. 480, 490–91, 100 S.Ct. 1254, 1262, 63 L.Ed.2d 552 (1980).[3]

We find unpersuasive the defendants' contention that § 2–102 of the Mental Health Code does not apply to USTs who are placed in the custody of the DMHDD for treatment. The defendants argue that because USTs are committed to the custody of the DMHDD pursuant to the Criminal Code, *see* Ill.Rev.Stat. ch. 38, § 104–17(b) (1981), the provisions of the Mental Health

---

**2.** The average length of stay of USTs at Chester is seven months.

**3.** Liberty interests may, of course, originate in the due process clause itself. *Shango v. Jurich,* 681 F.2d 1091, 1097 (7th Cir.1982). Because

we find a state-created liberty interest in this case, we do not have to decide whether the Constitution itself creates a liberty interest that is implicated when USTs are assigned to Chester.

Code do not govern the conditions of a UST's confinement. The Criminal Code, the defendants maintain, exclusively governs the duration and conditions of a UST's commitment; and defendants reason that because the Criminal Code does not create an entitlement for USTs to be treated in the least restrictive environment, no state-created liberty interest is implicated in this case.[4]

Contrary to the defendants' contention, the Criminal Code does not constitute the only law that governs the conditions of a UST's confinement. A criminal court merely remands a UST to the custody of the DMHDD for treatment. As the defendants correctly note, the DMHDD must choose the facility to which the UST will be assigned. Under Illinois law, this decision must be made in light of the statutory rights created by the Mental Health Code— in particular, § 2–102 which creates an entitlement to be treated "in the least restrictive environment."

Section 2–102 does not limit its application to persons admitted to the DMHDD's custody pursuant to the provisions of the Mental Health Code. Rather, the section is written more broadly to encompass "recipients of services." As noted above, USTs are placed in the DMHDD's custody for treatment (i.e. as recipients of services) and thus are entitled to § 2–102's protection.

Moreover, the Criminal Code, by its terms, does not constitute the only Illinois law pertaining to a UST's treatment and conditions of confinement. Section 104–29 of the Criminal Code states that in the event of a *conflict* with the Mental Health Code, the Criminal Code provision shall apply. The legislature did not state that a UST's treatment and confinement will be governed solely by the Criminal Code, but rather contemplated that the Criminal and Mental Health Codes together would form the statutory law applicable to a UST's treatment and confinement. Because § 2–102 of the Mental Health Code does not conflict with the Criminal Code, USTs are entitled to treatment in the least restrictive environment.

■ Having determined that the plaintiffs have demonstrated a state-created liberty interest deserving of due process protection, we would normally address the issue of what process is due. *See Shango v. Jurich,* 681 F.2d 1091, 1097 (7th Cir.1982). However in this case, the defendants' sole

---

4. Prior to 1979, a person adjudged by a criminal court unfit to stand trial, was remanded to a hospital and a hearing was ordered to determine whether he was civilly committable under the Mental Health Code. *See* Ill.Rev.Stat. ch. 38, § 1005–2–2(a) (1977). It was possible that a defendant could be unfit but not committable under the Mental Health Code; he might not be in need of mental health treatment. Such a person would be placed in legal limbo. He could not be tried but was left at liberty while criminal charges were pending. *See* Fitzpatrick, *Unfit to Stand Trial: The Dilemma and a Proposal,* 60 Chi.Bar Rec. 226 (1978). Apparently in response to this problem, the Illinois legislature adopted P.A. 81–1217, 1979 Ill.Laws 4893. *See* Paull, *S.B. 133: The Near Resolution of a Major Problem: Fitness in the Criminal Law,* 56 Chi.-Kent L.Rev. 1107 (1980). This statute eliminated the process of remanding a UST to a hospital for a hearing on whether the person is committable under the Mental Health Code. Under the current law, if a defendant is found unfit because of a mental disability, the criminal court may order him placed in the custody of the DMHDD. Ill.Rev.Stat. ch. 38, § 104–17(b) (1981). Moreover, if a UST's dis-

ability is not mental, the court has authority to order him placed in facilities designed to treat his particular disability. *Id.* ch. 38, § 104–17(c).

The named plaintiff was found unfit to stand trial prior to 1979 and the enactment of P.A. 81–1217. The plaintiff, however, does have standing to represent the entire class of plaintiffs with respect to the procedural due process claim. The plaintiff, and all members of the class, have suffered the same type of injury (placement in Chester) as a result of the challenged conduct—the practice of automatically assigning male USTs to Chester. Thus the requirements of Article III are satisfied. *See Blum v. Yaretsky,* —— U.S. ——, 102 S.Ct. 2777, 2783, 2784 n. 13, 73 L.Ed.2d 534 (1982). Moreover, the plaintiffs do not rely on P.A. 81–1217 as the source of any of their legal rights. Rather, the *defendants* point to this statute in an attempt to demonstrate that § 2–102 of the Mental Health Code has no application to USTs committed after 1979. The defendants, of course, have standing to make this defense based on their view of P.A. 81–1217.

contention regarding the plaintiffs' due process claim is that no liberty interest is implicated; defendants do not challenge the extent of the procedures ordered by the district court to be followed before a UST may be assigned to Chester in the future. These procedures include: (1) notice of proposed assignment to Chester, (2) a right to a hearing, (3) a decisionmaker who is a professional in mental health care, and (4) a decision based on evidence introduced at the hearing. Because the defendants do not take issue with these specific procedures, we will not apply the factors delineated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to determine whether due process requires all of these ordered procedures.[5]

We emphasize the point that in this case we are not recognizing a federal constitutional right to be treated in the least restrictive environment.[6] Rather, because Illinois has created such an entitlement, minimum procedural requirements must be followed before a UST is assigned to Chester. "The guarantee of procedural due process places restrictions on the manner in which the government may undertake actions that [bear] upon the rights of the citizenry; it imposes no limitation on the ends that such governmental action, accompanied by procedures, may achieve." *Owen v. Lash,* 682 F.2d 648 (7th Cir.1982).

### III. ACCESS TO THE COURTS

■ It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). We have held that this right is possessed not only by convicted prisoners, but by pretrial detainees who are jailed pending trial. *See Lock v. Jenkins,* 641 F.2d 488, 498 (7th Cir.1981). The plaintiffs in this case deserve no less constitutional protection. Not only are they criminal defendants, they have special relationships with the courts by virtue of their UST status. For instance, Illinois law requires a hearing every ninety days to determine if the UST is fit to stand trial. *See* Ill.Rev. Stat. ch. 38, § 104–20 (1981). The court, depending on its findings, may set a trial date, may order the UST's treatment plan modified, or may order a discharge hearing to be held if the UST is found likely not to be competent to stand trial for a year. *See id.*

### A. Telephone Policy

■ We agree with the district court that Chester's telephone policy amounts to an unconstitutional denial of meaningful access to the courts. The right of access to the courts means, among other things, that the plaintiffs must have a reasonable opportunity to seek and receive the assistance of attorneys. *See Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974). Regulations that unjustifiably obstruct the availability of professional representation are invalid. *Id.* Chester's telephone policy is such an unconstitutional restriction.

Because the plaintiffs are facing criminal charges, they all have the right to be represented by counsel. Telephone communications between the plaintiffs and their counsel, however, are severely restricted. Chester limits a UST's telephone calls to two, ten-minute calls a week; no incoming calls

---

**5.** The plaintiffs also contend that the DMHDD policy of automatically assigning all male USTs to Chester and all female USTs to Elgin, a less restrictive facility, constitutes a denial of equal protection. The district court held in favor of the defendants on this claim. In light of our holding that the practice of automatically assigning all male USTs to Chester is unconstitutional, we do not reach the plaintiffs' equal protection claim. With the institution of the procedures ordered by the district court, it is likely that some male USTs will not be assigned to Chester; no one will be assigned to Chester without an opportunity for an individualized hearing. The plaintiffs do not contend that it violates equal protection by exposing only males to the "risk" of being hospitalized in Chester. Because our disposition of the plaintiffs' due process claim substantially alters the texture of the plaintiffs' equal protection claim, we do not reach this constitutional question.

**6.** The issue of the existence of such a right is not presented in this appeal.

are permitted. Obviously, if a UST needs or wants to call his family twice during a week, he cannot telephone his attorney that week.[7] The defendants do not justify their telephone policy in terms of treatment or security, but instead contend that the policy is well within their administrative discretion. We disagree; because the telephone policy unreasonably restricts communications between a UST and his attorney, the restriction is invalid.[8]

B. Law Library

We do not agree with the plaintiffs that the district court erred in not ordering the defendants to establish a law library at Chester. In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court recognized that there are a variety of ways to insure meaningful access to the courts; the creation of a law library is but one alternative. *See id.* at 830, 97 S.Ct. at 1499. The right of access is satisfied if, in lieu of a law library, adequate assistance of counsel is provided. *Id.* at 828, 97 S.Ct. at 1498. All of the plaintiffs are entitled to be represented by attorneys, and with the lifting of the severe telephone restrictions, adequate assistance of counsel will be available. Moreover, the plaintiffs were placed in the custody of the DMHDD because they were found unable to "understand the nature and purpose of the proceedings" against them, Ill.Rev.Stat. ch. 38, § 104–10 (1981); therefore a law library would presumably be of little aid to the plaintiffs.

## IV. RESTRICTIONS ON FREEDOM OF MOVEMENT

The plaintiffs contend that restrictions on their freedom to move around the Chester facility and grounds deprive them of substantive liberty interests in violation of the due process clause of the Fourteenth

Amendment. In particular, two practices are challenged—confining the plaintiffs indoors except for rare occasions, and locking the plaintiffs in their rooms while the staff personnel have their meals. We agree with the district court that the plaintiffs are unconstitutionally denied the freedom to go outdoors more often. Also agreeing with the district court, we hold that the practice of locking up the plaintiffs during staff meals is a legitimate restriction on the plaintiffs' liberty.

Freedom of bodily movement has always been recognized as the core of the liberty protected by the due process clause from arbitrary governmental action. *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982); *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 18, 99 S.Ct. 2100, 2109, 60 L.Ed.2d 668 (Powell, J., concurring). This liberty interest in freedom of movement survives criminal conviction and involuntary commitment. *Youngberg v. Romeo,* 102 S.Ct. at 2458. The plaintiffs, therefore, involuntarily committed for treatment to render them fit to stand trial, retain liberty interests in freedom from such restraints.

These interests, however, are not absolute. There are occasions when the state, in operating an institution such as Chester, must restrain the movement of residents—for example, to protect patients, staff, and visitors from violence. In this case, therefore, the question "is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint . . . is such as to violate due process." *Id.* at 2460.

To determine whether the plaintiffs' constitutional rights have been violated, it is necessary to balance the plaintiff's liberty interests against the relevant state

---

**7.** The telephone is a valuable tool of communications at Chester because seventy percent of the USTs are from Cook County, 370 miles from the Chester facility.

**8.** The district court, after finding Chester's phone policy unconstitutional, left it up to the parties to fashion a specific remedy. The order

submitted by the parties and entered by the court provides that residents of Chester shall be allowed reasonable opportunities to telephone their attorneys, subject to the limitation that no resident is permitted to "effectively prevent other [residents] from use of the telephone."

interests in securing a safe facility in which treatment can be administered. *See id.* at 2460–61. It is not our duty, however, to perform the balancing. The Constitution only requires us to make certain that in deciding to restrict the movements of the plaintiffs, a *professional judgment* was exercised. See *id.* at 2161–62; *Bell v. Wolfish,* 441 U.S. 520, 540 n. 23, 99 S.Ct. 1861, 1874 n. 23, 60 L.Ed.2d 447 (1979). The plaintiffs' freedom of movement may be restrained when and to the extent professional judgment deems it necessary to assure security or to provide needed treatment.

■ This is not to say that a state's concern for institutional security can always legitimate restraints on the plaintiffs' liberty. In *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), a case involving the commitment of a criminal defendant found unfit to stand trial, the Supreme Court stated that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.* at 738, 92 S.Ct. at 1858. The plaintiffs in this case are committed "to undergo treatment for the purpose of rendering [them] fit" to stand trial. *See* Ill.Rev.Stat. ch. 38, § 104–16(d) (1981). Severe restrictions on the plaintiffs' freedom of bodily movement could be reasonably related to the goal of maintaining institutional security, but at the same time, could eliminate the prospect of rendering the plaintiffs fit to stand trial; it is progress toward that goal that justified the plaintiffs' commitment, *see Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972).

With the scope of our constitutional inquiry defined, we turn to the challenged restraints on liberty in this case. The Chester facility contains large courtyards that are suitable for outdoor activities. The superintendent of Chester testified that it is Chester's policy to allow outdoor activities five times a week, weather permitting. Indeed, a memorandum from Chester's Director of Activity Therapy Services indicates that courtyard activities will be provided if "outside temperature exceeds 35°." The practice at Chester, however, does not coincide with the stated policy. Uncontradicted evidence demonstrates that USTs at Chester are rarely, if ever, permitted outdoors from September through March. During the other months, the plaintiffs, contrary to Chester's policy, are not free to go outdoors five times a week. 521 F.Supp. at 731.

■ The defendants have not asserted any reason for their failure to permit outdoor activities pursuant to their policy. We have no difficulty agreeing with the district court that "[w]ere defendants to act in accordance with their policy, plaintiffs' claim would have to be denied." *Id.* However, "in the absence of *any justification* by defendants for limiting plaintiffs' access to outdoor activities, the Court must hold that plaintiffs' due process rights" have been violated. *Id.* (emphasis added). The plaintiffs' freedom of movement at Chester is limited and the defendants have not justified this restriction in terms of legitimate interests in treatment and security; therefore, in confining the plaintiffs indoors, we are not "certain that professional judgment in fact was exercised," *Youngberg v. Romeo,* 102 S.Ct. at 2461.[9]

■ The district judge wisely chose not to draft a specific remedy regarding this issue. He believed "that the parties, who have intimate knowledge of the procedures and conditions at Chester, should be provided with an opportunity to fashion [a] mutually agreeable remed[y] ... within the guidelines provided" by the district court's opinion. 521 F.Supp. at 733. The parties drafted the district court's order which details a flexible policy of outdoor "opportunities"; the defendants are free to confine

9. In this case, a "professional judgment" is not synonymous with a decision made by a person "competent, whether by education, training or experience, to make the particular decision at issue," *Youngberg v. Romeo,* 102 S.Ct. at 2462 n. 30. A judgment is not "professional" if it is not based on a view as to how best to operate a mental health facility.

USTs indoors if the weather is inclement or a security risk is presented. The defendants do not contend that the order will interfere with the safe and effective operation of the Chester mental health facility. The district court's order with respect to outside activities is therefore affirmed.

 The defendants' other practice challenged as an illegal restraint on the plaintiffs' freedom of movement—locking the plaintiffs in their rooms while the staff eats—is a constitutionally permissible curtailment of the plaintiffs' liberty. As the district court noted, "[f]aced with staffing limitations and the overriding need to maintain internal security, defendants have made a particular administrative decision for purposes of preserving order during staff meal periods." 521 F.Supp. at 731. It might be preferable if the Chester facility had sufficient staff members to avoid the need for this restraint on the plaintiffs' liberty. Due process, however, does not guarantee the plaintiffs the right to be treated in the least restrictive environment that money can buy. Moreover, there is no suggestion that the limited time that the plaintiffs are confined to their rooms undermines the purpose of the plaintiffs' commitment—treatment. The defendants' practice, here based on a professional judgment concerning how best to operate Chester, is therefore constitutional.

## V. DAMAGES

 In addition to injunctive relief, the plaintiffs sought monetary damages from the defendants. The district court, however, refused to award any damages. Finding that the defendants are entitled to qualified immunity, we affirm the district court's judgment on this matter.

Public officials, acting within the scope of their official responsibilities, are entitled to some measure of protection from personal liability arising out of the performance of their duties. This protection, embodied in the doctrine of qualified immunity, represents "an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, . . .

but also 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.' " *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 2733, 73 L.Ed.2d 396 (1982) (quoting *Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978)). The defendants, public officials who perform important functions within the Illinois mental health system, are therefore shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 102 S.Ct. at 2738.

We believe that the defendants did not violate the plaintiffs' *clearly established* constitutional rights and thus cannot be held liable for damages. When state officials act, they cannot be expected to anticipate subsequent legal developments nor can they be said to "know" that the law forbids conduct not previously identified as unlawful. *See id.* 102 S.Ct. at 2739. We are aware of no prior case that has interpreted or determined the significance of Ill.Rev. Stat. ch. 91½, § 2–102—the source of the state-created liberty interest in this case. The defendants' practice of making general regulations (e.g. all male USTs are assigned to Chester) is not, in itself, an unconstitutional practice. The defendants should not be held liable for failing to identify § 2–102, to relate this provision to the Fourteenth Amendment, and to institute procedures that satisfy the minimum requirements of due process.

Similarly, Chester's telephone policy which illegally restricts access to the courts, is not *clearly* unconstitutional. Although a constitutional right of meaningful access to the courts is clearly established, we know of no prior case that has relied on this right to hold invalid a regulation of a mental health facility. Moreover, the restrictive policy that is held invalid in this case might be constitutional in some other circumstances in which the restriction is based on compelling governmental interests. A reasonable

person, therefore, would not have known that Chester's telephone policy violated the plaintiffs' clear constitutional rights.

Finally, the unconstitutional infringement on the plaintiffs' freedom to move around the grounds at Chester does not warrant monetary damages. As evidenced by the parties' positions, the law controlling this substantive due process issue had been quite unsettled. The defendants would have had us evaluate the constitutionality of the restrictions on liberty by means of a "cruel and unusual punishment" analysis; the plaintiffs, on the other hand, have urged us to recognize a constitutional right to outdoor activity. In fact, the Supreme Court's recent decision in *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), requiring us to make certain that a professional judgment was exercised, has governed our disposition of this issue. The defendants cannot be held responsible for failing to divine and apply the proper test.

## VI. ATTORNEY FEES

After the district court issued its judgment on the plaintiffs' constitutional claims, the plaintiffs' attorneys petitioned the court for reasonable attorneys' fees pursuant to 42 U.S.C. § 1988. Multiplying the number of hours worked by a reasonable hourly rate,[10] the petition detailed $40,-813.75 in attorneys' fees and $3,029.08 in expenses. The petition asked the district court to multiply these amounts by 1.5 and thus award $65,764.24 in attorneys' fees.

Ruling on the motion for attorneys' fees and expenses, the district court stated:

Although plaintiffs have not prevailed on all issues raised in their complaint, it is apparent that the work performed by their attorneys as to those issues where they prevailed cannot be segregated from work performed as to those issues where defendant prevailed. It is further the view of the Court that plaintiffs' proposed multiplier of 1.50 is fair and rea-

sonable in the context of the substantial issues presented in the instant case.

With an unexplained slight reduction, the court thus accepted the plaintiffs' calculation of attorneys' fees and expenses; an award of $62,565.96 was ordered.

The determination of reasonable attorneys' fees under 42 U.S.C. § 1988 is left to the sound discretion of the district court. *Muscare v. Quinn,* 614 F.2d 577, 579–80 (7th Cir.1980). When a trial judge elects a method of calculating attorneys' fees that constitutes an abuse of discretion, however, the matter must be remanded to the district court for further consideration. We must remand this case because the district court should have awarded attorneys' fees only for work performed on the plaintiffs' successful claims and should not have applied a 1.5 multiplier to the award.

Attorneys' fees should be awarded only for preparation and presentation of those claims on which the plaintiff prevailed. *Busche v. Burkee,* 649 F.2d 509, 522 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Muscare v. Quinn,* 614 F.2d 577, 581 (7th Cir.1980). We recognize that an attorney's efforts are not always neatly segregated between various claims. Thus an award of attorneys' fees may include "time spent on unsuccessful claims to the extent such time would have been spent in connection with the successful claims even if the unsuccessful claims had not been brought." *Busche v. Burkee,* 649 F.2d at 521.

We can discern no basis for the district court's contention that "it is apparent that the work performed by [plaintiffs'] attorneys as to those issues where they prevailed cannot be segregated from work performed as to those issues where defendant prevailed." The plaintiffs' case was not composed of a solitary, prevailing claim. The plaintiffs did not prevail on at least two of their constitutional claims—a claimed right to a law library and an alleged right not to

---

10. The hourly rates employed were $80.00 an hour for the lead attorney and $60.00 an hour for an assisting attorney.

be confined to their rooms during staff meals. A review of the briefs filed in the district court indicates that a fair, if not substantial amount of time was spent researching and advancing those claims. The district court, therefore, should not have awarded fees for all of the work performed by the plaintiffs' attorneys.

Moreover, we do not believe that this is a proper case for the use of a multiplier. We have held that the factors set forth in Rule 2–106 of the ABA's Code of Professional Responsibility should guide the decision whether to increase an award beyond a reasonable amount as determined by multiplying the hours worked by a reasonable hourly rate. *See Strama v. Peterson,* 689 F.2d 661, 664 (7th Cir.1982). The Code of Professional Responsibility states that

Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

The district court, only noting the "substantial issues" presented in this case, increased the reasonable attorneys' fee award by fifty percent.

We do not dispute the district court's characterization of the issues in this case as "substantial"; however, we are reluctant to approve the use of a multiplier based solely on the results achieved (i.e. factor (4)). *See Tidwell v. Schweiker,* 677 F.2d 560, 570 (7th Cir.1982); *cf. Bonner v. Coughlin,* 657 F.2d 931, 936 (7th Cir.1981) (the contingent nature of a fee does not alone justify the use of a multiplier). The district court did not refer to any other factor outlined in the Code of Professional Responsibility and from our own review of those factors, we find no basis for using a multiplier in this case. Compensation for the quality of the attorneys' services is reflected in the reasonable hourly rates. *See Tidwell v. Schweiker,* 677 F.2d 560, 570 (7th Cir.1982). Moreover, because this litigation was spread over three years, the attorneys were not precluded from accepting other employment, nor were they operating under peculiar time limitations. *See Strama v. Peterson,* 689 F.2d 661, 665 (7th Cir.1982). Finding insufficient support for the use of a multiplier, we hold that the district court erred in increasing the plaintiffs' reasonable attorneys' fees by fifty percent.

## VII.

The judgment of the district court resolving the case on the merits is affirmed. The judgment awarding attorneys' fees, however, is vacated and the case is remanded to the district court to award, without the use of a multiplier, reasonable attorneys' fees for the claims on which the plaintiffs prevailed.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting in part.

The majority affirms the district court in holding that the DMHDD practice of assigning all male USTs to Chester, a maximum security mental health facility, violates the plaintiff's procedural due process rights under the Constitution. A state-created liberty interest entitled to the protection of the federal due process clause is found in the Illinois Mental Health Code. Therefore, it is held that a UST before assignment to Chester must, within the Mental Health Department, be given separate notice, hearing, and a decision based on the evidence. As I read the Illinois Crimi-

nal Code, I see no need for our federal concern and intervention.

Presenting my different view of the Illinois law requires at least a general look at certain comprehensive sections of the Criminal Code. The Code provides that a defendant's fitness may be raised at any time by the court, state, or defendant. The court then, in its discretion, and at the defendant's request, may appoint an expert to examine the defendant and make a detailed report to the court.[1] If the issue of fitness involves the defendant's mental condition, there are further provisions. The court is directed to order an examination of the defendant by one or more licensed physicians, clinical psychologists, or psychiatrists chosen by the court.[2] An indigent defendant may, in addition, have an expert of his choice appointed by the court.[3] If the report indicates the defendant is not fit to stand trial, the report may include "a general description of the type of treatment needed and of the least physically restrictive form of treatment therapeutically appropriate."[4] The degree of possible restriction thus becomes a statutory concern of the court early in the proceedings. A fitness hearing follows,[5] with either a judge or jury acting as factfinder.[6] Once it is determined that the defendant is unfit to stand trial, the critical issue then becomes whether there is substantial probability that the defendant, if provided treatment, will become fit within one year. The resolution of that issue determines other procedures which are to follow.

If the factfinder concludes that the UST, despite treatment, will probably not attain fitness within a year, the Criminal Code provides several routes which the case may take. The defendant or the state may request a separate discharge hearing,[7] or the state may elect to request the court to release the defendant from custody, and dismiss the charges against him with prejudice. The state may alternatively request the court to remand the defendant to the custody of the Mental Health Department and order a hearing in accordance with the Mental Health Code. The court may then dismiss the criminal charges without prejudice to reinstatement. The defendant, under this alternative, thereby becomes a former defendant and the statute provides that the "patient" thereafter shall be treated like any other civilly committed patient for all purposes, including selection of place of treatment. The Mental Health Code then takes over and provides that if there is an objection to a transfer between Department of Mental Health facilities, there shall be a hearing before a "utilization review committee." If the proposed transfer is to a facility which is "substantially more physically restrictive than the transferring facility," the committee decides if the transfer is necessary for the safety of the patient or others. Notice is provided with the burden of proof placed upon the Mental Health Department.[8] I can envision no more due process than the Illinois Statute already gives USTs in this category with an unlikely prognosis, and therefore see no need for this court to be imposing federal constitutional principles.

A different set of procedures apply, however, if the factfinder at the fitness hearing determines that a defendant is unfit and either it cannot be determined whether a substantial probability exists that the defendant will attain fitness in one year, or it is determined that there is a substantial probability of achieving fitness in one year. Following either finding, the court shall order the defendant to undergo treatment.[9] This is an appealable order. In directing treatment, the court is given wide discre-

1. Ill.Rev.Stat. ch. 38, §§ 104–11(a) and (b).

2. Ill.Rev.Stat. ch. 38, § 104–13(a).

3. Ill.Rev.Stat. ch. 38, § 104–13(e).

4. Ill.Rev.Stat. ch. 38, § 104–15(b).

5. Ill.Rev.Stat. ch. 38, § 104–16.

6. Ill.Rev.Stat. ch. 38, § 104–12.

7. Ill.Rev.Stat. ch. 38, § 104–25.

8. Ill.Rev.Stat. ch. 91½, § 3–910.

9. Ill.Rev.Stat. ch. 38, § 104–17.

tion. If the defendant is eligible to be or has been released on bail, the court shall select the least physically restrictive form of therapeutically appropriate treatment. The court may also order the defendant placed for treatment with the Mental Health Department, or any other appropriate public or private mental health facility agreeing to provide treatment. Treatment may be either on an in-patient or out-patient basis. This is followed by a requirement that the person supervising the defendant's treatment file a report "assessing the facility's or program's capacity to provide appropriate treatment" and assessing the likelihood of the defendant attaining fitness within one year. If fitness is foreseeable, the supervisor must file a treatment plan with the court. Interim progress reports to the court are also required.[10] Within ninety days of ordering treatment, the court must conduct a hearing to assess the defendant's progress. If the court is not satisfied with the defendant's progress, the court may continue or modify the original treatment order. The court has and continues to have broad control and discretion.

This category of USTs may also demand a discharge hearing before the court.[11] Evidence may be introduced at the hearing relevant to defendant's guilt. Unless the discharge hearing [12] results in a judgment of acquittal, the court may remand the defendant for further treatment, and extend the one-year time limit, the duration depending on the crime charged. At the expiration of the court-extended treatment period, provided the defendant is still not fit to stand trial, the court has several options. One option is to commit the defendant to the Mental Health Department for a hearing under the Mental Health Code. In that event, the criminal charges are dismissed without prejudice to later reinstatement. This former defendant, now only a patient, is specifically to be treated as any other civilly committed patient. The court may, under another option, remand the defendant to the Department of Mental Health for further treatment if the defendant can be reasonably expected to inflict serious physical harm upon himself or others. This remand period shall not exceed the maximum criminal sentence the defendant might have received upon conviction. There is no provision under this option giving the Department of Mental Health power to select the place of treatment.

A distinction is made in the Criminal Code between defendants who remain defendants and defendants who are transformed into patients to be treated as any other civilly committed patients by Mental Health. Based on that distinction the court maintains full control over "defendants," but for "patients" substantial control is given to Mental Health. That distinction does not appear to be clearly irrational.

In my judgment, these criminal code provisions relating to that category of USTs remanded to Mental Health not as "patients," but as defendants, places full responsibility with the court to determine and monitor treatment with the aid of various experts and supervisors. The "least restrictive" guideline is mentioned several times in the Criminal Code. The court may order care on an out-patient or in-patient basis. Periodic progress reports are required, as are hearings on the defendant's progress with full power in the court to modify its orders as to facility or program.[13] I find nothing in the Mental Health Code that suggests that it is the Mental Health Department that makes those decisions for defendants, but in any event in case of conflict, the Criminal Code prevails.[14]

I believe the Criminal Code and the Mental Health Code in concert provide full due process for all categories of USTs. I see no need to impose another hearing in Mental Health for all USTs before "a decisionmaker who is a professional in mental health

---

10. Ill.Rev.Stat. ch. 38, § 104–18.

11. Ill.Rev.Stat. ch. 38, § 104–23(a).

12. Ill.Rev.Stat. ch. 38, § 104–25.

13. Ill.Rev.Stat. ch. 38, § 104–20(d).

14. Ill.Rev.Stat. ch. 38, § 104–29.

cases," as required by the majority opinion. That creates an unnecessary potential for conflict over resolution of some of the same or overlapping issues between a court and a professional mental health hearing officer. I would ordinarily expect more "due process" for USTs from a supervising judge than from a professional in mental health. Considering the long statutory process of examinations, reports, and hearings already provided, I see no need for us to add yet another hearing in the name of federal due process. Another hearing in this long process might itself be enough to render even a fit person unfit. I believe Illinois courts have all the statutory authority they need, if they choose to exercise it, to fully and constitutionally look out for the welfare and treatment of USTs in the least restrictive therapeutically appropriate environment. The statutory scheme may not be as clear as it might be, but it is clear enough for me not to join in imposing an unnecessary federal remedy on the state process.

The telephone use policy at Chester is restrictive, but not so restrictive as to be beyond institutional discretion and unconstitutional. Although I disagree with the majority on this issue as a matter of law, I also believe the new policy fashioned by the parties themselves, mentioned by the majority in footnote 8, is a preferable and reasonable policy.

My only other point of difference with the majority concerns the court's finding that the limitations on outdoor exercise periods at Chester are also unconstitutional. I agree with the state that there are conflicting material fact issues. The district court should consider the totality of the recreational programs at Chester, not base its judgment on one aspect only of recreation. That renders the issue unsuitable for disposition by summary judgment. I would reverse and remand that issue for trial.

To this extent, I respectfully dissent.