723 F.2d 1263
 MARY BETH G. and Sharon N., Plaintiffs-Appellees,
v.
CITY OF CHICAGO, Defendant-Appellant.
Mary Ann TIKALSKY, Plaintiff-Appellee, Cross-Appellant,
v.
CITY OF CHICAGO, et al., Defendants-Appellants, Cross-Appellees.
Hinda HOFFMAN, Plaintiff-Appellee,
v.
CITY OF CHICAGO, Defendant-Appellant.
 Nos. 82-1894, 82-1920, 82-2605, 83-1618 and 83-2203.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 16, 1983.
Decided Nov. 29, 1983.
As Modified on Denial of Rehearing and Rehearing En Banc
Jan. 20, 1984.
 
 Mary K. Rochford, Corp. Counsel, Chicago, Ill., for City of Chicago.
 G. Flint Taylor, Peoples Law Office, Edward T. Stein, Singer & Stein, Fay Clayton, Sachnoff, Weaver & Rubenstein, Chicago, Ill., for plaintiffs-appellees.
 Before BAUER, WOOD, Circuit Judges, and NEAHER, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 The four plaintiffs-appellees in these consolidated cases are all women who were arrested for misdemeanor offenses and strip searched by matrons in lockups maintained by the City of Chicago while awaiting the arrival of bail money. The strip searches were conducted in accordance with a policy of the City that existed from 1952 to 1980. That policy required a strip search and a visual inspection of the body cavities of all women arrested and detained in the City lockups, regardless of the charges against the women and without regard to whether the arresting officers or detention aides had reason to believe that the women were concealing weapons or contraband on their persons. The policy did not apply to men, who were subjected to a thorough hand search.
 
 I. BACKGROUND
 
 2
 Three of the plaintiffs-appellees, Mary Beth G., Sharon N., and Hinda Hoffman, were plaintiffs in a class action suit, Jane Does v. City of Chicago, No. 79 C 789 (N.D.Ill. Jan. 12, 1982), filed on March 1, 1979. Plaintiffs in that case alleged that the strip search policy of the City of Chicago was unconstitutional. The parties subsequently entered into an agreement and stipulation in settlement of the plaintiffs' claims for injunctive relief whereby the City was permanently enjoined from instituting strip searches or body cavity searches on women and not on similarly situated men and from performing strip searches of any person charged with a traffic, regulatory, or misdemeanor offense unless police reasonably believed that the arrestee was concealing weapons or contraband.[1] The terms of the agreement and stipulation, set out in an order filed with the district court on March 26, 1980, made clear that the change in policy was not an admission of liability on the part of the defendants.
 
 
 3
 Thereafter, the plaintiffs moved to sever the issues of the defendants' liability and the constitutionality of the strip search policy; the district court granted this motion. Plaintiffs then moved for partial summary judgment, maintaining that the strip search policy was unconstitutional on its face. The district court agreed with plaintiffs and held that the search policy of the City violated the fourth amendment, as incorporated by the fourteenth amendment, and the equal protection clauses of the fourteenth amendment and the Illinois constitution. Jane Does v. City of Chicago, No. 79 C 789 (N.D.Ill. Jan. 12, 1982). The court ordered that the parties select typical cases to separate out for trial on the issue of plaintiffs' damages. Pursuant to this order, jury trials on the issue of damages were held, and verdicts of $25,000 were returned for plaintiffs Mary Beth G. and Sharon N., and an award of $60,000 was returned for Hinda Hoffman. The City appeals from the district court's determination that the strip search policy was unconstitutional and contests the size of the damage awards.
 
 
 4
 The remaining plaintiff-appellee, Mary Ann Tikalsky, commenced her suit on August 16, 1978, naming as defendants two Chicago police officers. Her complaint alleged false arrest and the use of excessive force in violation of the Civil Rights Act. On June 15, 1979, after commencement of the Jane Does class action suit, plaintiff amended her complaint to include a charge of unlawful search and seizure. Named as additional defendants were the City of Chicago and various other officials and officers of the Chicago Police Department. After a jury trial, the defendant police officers were acquitted of the false arrest and use of excessive force charges, but plaintiff prevailed against the City and one individual defendant on the illegal search claim. Plaintiff received compensatory damages in the amount of $30,000. Immediately thereafter, the district court granted judgment notwithstanding the verdict in favor of the individual defendant. The district court also ordered a new trial for the City after the court concluded that the jury had been improperly instructed. The plaintiff appealed the order granting the new trial to this court, and we held that the jury instructions were proper. Tikalsky v. City of Chicago, 687 F.2d 175 (7th Cir.1982). We ordered that the case be remanded to the district court and that the verdict and award against the City be reinstated. On remand, the district court reinstated judgment on the verdict against the City and subsequently awarded plaintiff $2,000 in attorney's fees and $2,426.85 in costs. The City appeals the judgment, and plaintiff cross-appeals from the district court's order respecting the award of attorney's fees and costs.
 
 
 5
 Although the circumstances surrounding the arrests and detentions of each of the plaintiffs-appellees in these consolidated cases are not identical, the situations involve the following common elements: each woman was arrested for a misdemeanor offense[2] and each was subjected to the strip search policy of the City of Chicago.[3] That policy, as described by the City, required each woman placed in the detention facilities of the Chicago Police Department and searched by female police personnel to:
 
 
 6
 1) lift her blouse or sweater and to unhook and lift her brassiere to allow a visual inspection of the breast area, to replace these articles of clothing and then
 
 
 7
 2) to pull up her skirt or dress or to lower her pants and pull down any undergarments, to squat two or three times facing the detention aide and to bend over at the waist to permit visual inspection of the vaginal and anal area.[4]
 
 
 8
 The strip search policy was not applied to males. Male detainees were subject to a strip search only if the arresting officers or detention aides had reason to believe that the detainee was concealing weapons or contraband. Otherwise, men were searched thoroughly by hand. The male detainee would place his hands against the wall and stand normally while the searching officer, with his fingers, would go through the hair, into the ears, down the back, under the armpits, down both arms, down the legs, into the groin area, and up the front. The officer would also search the waistband and require the detainee to remove his shoes and sometimes his socks. Originally, women detainees were also searched in this manner, but in 1952 the City changed its policy and began conducting the strip searches.
 
 II. CONSTITUTIONAL QUESTIONS
 
 9
 The district court in the Jane Does case found that, as a matter of law, the strip search policy conducted by the City violated the fourth amendment, as applicable to the states through the fourteenth amendment, and the equal protection clause of the fourteenth amendment. The court also determined that the policy violated the equal protection provision of the Illinois constitution respecting gender. Ill. Const. (1970), art. I, sec. 18.[5] The federal constitutional grounds were also raised in the jury trial of plaintiff-appellee Tikalsky and served as a basis for the verdict insofar as the jury relied on them. Because the equal protection provision of the Illinois constitution respecting gender is at least coextensive with the requirements of the fourteenth amendment, People v. Ellis, 57 Ill.2d 127, 311 N.E.2d 98 (1974), we need only discuss the federal constitutional grounds for challenging the strip search policy, as we find both grounds have merit.
 
 
 10
 A. Fourth Amendment Ground.
 
 
 11
 The fourth amendment of the United States Constitution, deemed incorporated into the fourteenth amendment and applicable to the states, provides that:
 
 
 12
 [t]he right of the people to be secured in their persons ... against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause ....
 
 
 13
 Because the prohibition announced by the fourth amendment extends to "unreasonable" searches, our task is to decide whether the strip search policy of the City as applied to these plaintiffs-appellees was unreasonable under established fourth amendment principles.
 
 
 14
 The Supreme Court has adopted the position that searches of the person are generally impermissible absent a search warrant, which is to issue only on probable cause. New York v. Belton, 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1980) ("It is a first principle of Fourth Amendment jurisprudence that the police may not conduct a search unless they first convince a neutral magistrate that there is probable cause to do so."). The court has recognized, however, that a warrantless search may be reasonable if the exigencies of the situation compel an exception. Id.
 
 
 15
 The City argues that its strip search policy is valid under two recognized exceptions to the warrant requirement. One exception allows warrantless searches incident to custodial arrests. New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). A second exception permits warrantless searches incident to the detention of persons lawfully arrested. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); United States v. Edwards, 415 U.S. at 804-05, n. 6, 94 S.Ct. at 1238 n. 6. The two exceptions are related; both stem from the arrest process for which the Supreme Court has recognized several exceptions to the warrant requirement. The Supreme Court has observed, however, that "the factors justifying a search of the person and personal effects of an arrestee upon reaching a police station but prior to being placed in confinement are somewhat different from the factors justifying an immediate search at the time and place of arrest." Illinois v. Lafayette, --- U.S. ----, 103 S.Ct. 2605, 2609, 77 L.Ed.2d 65 (1983).
 
 
 16
 The search incident to arrest exception arose because of the need "to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape" and the need to prevent the concealment or destruction of evidence. Chimel v. California, 395 U.S. at 763, 89 S.Ct. at 2040. Initially, the Supreme Court attempted to tie strictly the scope of the search to " 'the circumstances which rendered its initiation permissible,' " id. at 762, 89 S.Ct. at 2039 (quoting Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968)), but the Court subsequently rejected that position in United States v. Robinson. The majority in Robinson was unwilling to place on the arresting officer the burden of deciding in each case "whether or not there [is] present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." 414 U.S. at 235, 94 S.Ct. at 476. It recognized that a "police officer's determination as to how and where to search the person of a suspect ... is necessarily a quick ad hoc judgment," and that the danger of concealed weapons alone provides "an adequate basis for treating all custodial arrests alike for purposes of search justification." Id. Consequently, the Court held that once an arrest based on probable cause has been made, no further examination into probable cause for the scope of the search is necessary; it concluded that the foundation of the search incident to arrest exception flows automatically from the fact of arrest:
 
 
 17
 A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.
 
 
 18
 Id.
 
 
 19
 Robinson establishes, therefore, that a police officer does not have to assess the likelihood that the individual arrestee is possessing a weapon or concealing evidence but may undertake a "full search" of an arrested person aimed toward the discovery of weapons, instruments of escape, and evidence that could otherwise be concealed or destroyed. It is worth noting, however, that in reaching this conclusion the Court was concerned mainly with whether a search calculated to disarm the suspect and to preserve evidence on the suspect's person could be undertaken, regardless of the reason for the arrest, not with the intensity of the particular search itself. The Court did not suggest that a person validly arrested may be subject to any search the arresting officer feels is necessary.[6] The majority merely concluded that because each arrest brings with it certain factors--dangers to and the need for ad hoc judgments by the police--the application of a straightforward rule that always permits a concomitant "full search" incident to custodial arrest aimed toward the discovery of weapons and contraband would conclusively be presumed to be a reasonable one. Police thus would be relieved of the responsibility of having to decide whether they could search a particular arrestee for weapons or contraband in the first instance. Under Robinson, a "full search" is the maximum intensity of the search allowable to achieve that end, unless specific reasons exist that justify intensifying the search. In characterizing what constitutes a full search incident to arrest, the Robinson Court quoted with approval language from Terry that describes a reasonable search incident to arrest as one involving "a relatively extensive exploration of the person," Terry v. Ohio, 392 U.S. at 25, 88 S.Ct. at 1882, quoted in United States v. Robinson, 414 U.S. at 227, 94 S.Ct. at 473. The majority specifically noted that it would be willing to find unconstitutional a search that was "extreme or patently abusive." 414 U.S. at 236, 94 S.Ct. at 477.
 
 
 20
 Although the time at which the plaintiffs-appellees in the cases before us were searched extends beyond what laypersons would probably consider "incident to the arrest," the Supreme Court has defined the arrest procedure broadly enough to include searches at the place of detention, since "that is no more than a continuation of the custody inherent in the arrest status." Illinois v. Lafayette, --- U.S. ----, 103 S.Ct. 2605, 2609, 77 L.Ed.2d 65 (1983). Thus, in United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Court held that authorities could exchange and search, with or without probable cause, the clothing of an arrestee who remained in custody overnight. The Court stated that exchanging and searching the arrestee's clothing and subjecting it to laboratory tests on the day after his arrest "was no more than taking from [him] the effects in his immediate possession that constituted evidence of crime. This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that [the arrestee] was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention." Id. at 805, 94 S.Ct. at 1238. The Court also observed that not only was the search a normal incident of a custodial arrest, but that it followed "the established and routine custom of permitting a jailer to search the person who is being processed for confinement under his custody and control" and that "little doubt has ever been expressed about the validity or reasonableness of such searches incident to incarceration." Id. at 804-05 n. 6, 94 S.Ct. at 1238 n. 6. In fact, the Court more recently has stated that
 
 
 21
 [t]he governmental interests underlying a stationhouse search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest. Consequently, the scope of a stationhouse search will often vary from that made at the time of arrest. Police conduct that would be impractical or unreasonable--or embarrassingly intrusive--on the street can more readily--and privately--be performed at the station. For example, the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him, although the step would be rare. This was made clear in United States v. Edwards....
 
 
 22
 103 S.Ct. at 2609. In Lafayette, however, the Court stated that "[w]e were not addressing in Edwards, and do not discuss here, the circumstances in which a strip search of an arrestee may or may not be appropriate." Id. at n. 2. Indeed, the focus in Edwards, as in Robinson, once again seems to have been on the permissible scope of searches incident to arrest; the Court accepted the proposition that the scope of the search at the stationhouse could be at least as broad as that at the time of the arrest, thus approving the search of items that were on the arrestee at the time of arrest. Edwards, however, also reaffirms the controlling principle that custodial searches incident to arrest still must be reasonable ones: "Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct 'must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.' " 415 U.S. at 808 n. 9, 94 S.Ct. at 1239 n. 9 (quoting Terry v. Ohio, 392 U.S. at 20, 88 S.Ct. at 1879).
 
 
 23
 In Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court explicitly explored the scope of permissible searches incident to incarceration. The challenged searches in Wolfish involved visual body cavity searches of federal pretrial detainees at the Metropolitan Correctional Center in New York City. The searches were made after every contact visit a detainee had with a person from outside the institution. To evaluate the reasonableness of these searches, the Court employed a balancing test that has now become a touchstone for fourth amendment analysis:
 
 
 24
 The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.
 
 
 25
 Id. at 559, 99 S.Ct. at 1884. Recognizing that a detention facility is a "unique place fraught with serious security dangers," id., and that the strip search policy might act as an effective deterrent to the smuggling of weapons or contraband into the institution, the Court held that the searches, in this instance, could be conducted on less than probable cause despite the significant privacy interests of the inmates. Id. at 560, 99 S.Ct. at 1885.
 
 
 26
 Absent precedent that is clearly controlling, it is incumbent on us to examine independently the searches conducted here in light of the requirement of the fourth amendment that they not be "unreasonable." We cannot say that the breadths of the exceptions relied on by the City clearly extend to the circumstances that exist in these cases. In none of the arrest situations presented here was a routine search incident to arrest conducted by the arresting officers; evidently, the arresting officers felt these women did not pose a danger to their safety. Even if a routine search incident to arrest had been undertaken, we believe that it would have been limited to the "full search" approved in Robinson, such as the thorough hand search performed there; the Robinson Court simply did not contemplate the significantly greater intrusions that occurred here. Similarly, the searches in the cases before us are qualitatively different from the delayed custodial searches upheld in Edwards. The authorities who exchanged and searched the arrestee's clothing in Edwards had probable cause to believe the articles of clothing the arrestee was wearing were themselves material evidence of the crime for which he had been arrested. United States v. Edwards, 415 U.S. at 805, 808 n. 9, 94 S.Ct. at 1238, 1239 n. 9. Although Edwards also confirms the authority of the police to exchange the arrestee's clothing for jail clothes and to keep the arrestee's clothing in official custody and search it even without probable cause, id. at 804, 94 S.Ct. at 1237, the intensity of such an intrusion--exchanging and searching one's clothes--is substantially less than that associated with the strip searches involved here.[7]
 
 
 27
 Wolfish is also not controlling because the particularized searches in that case were initiated under different circumstances. We have observed previously that the balancing test prescribed in Wolfish does not validate strip searches in detention settings per se. Tikalsky v. City of Chicago, 687 F.2d 175, 181-82 & n. 10 (7th Cir.1982); Bono v. Saxbe, 620 F.2d 609, 617 (7th Cir.1980); see also Salinas v. Breier, 695 F.2d 1073, 1085 n. 1 (7th Cir.1982) (Cummings, C.J., concurring). But see Clements v. Logan, 102 S.Ct. 284, 70 L.Ed.2d 461 (Rehnquist, Circuit Justice, 1981) (temporary stay pending hearing on cert. petition), cert. denied, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). Although the majority in Wolfish did uphold the strip searches conducted there on less than probable cause, the detainees were awaiting trial on serious federal charges after having failed to make bond and were being searched after contact visits. In the cases before us, however, plaintiffs-appellees are minor offenders who were not inherently dangerous and who were being detained only briefly while awaiting bond.[8] In light of the substantial nature of the intrusions involved, we believe these differences are sufficiently significant to compel our own inquiry as to whether the strip searches conducted by the City were "reasonable" under the fourth amendment.
 
 
 28
 Our starting point is the balancing test announced in Wolfish, beginning with the magnitude of the invasion of personal rights. In Tinetti v. Wittke, 620 F.2d 160 (7th Cir.1980), we adopted the opinion of Judge Warren, 479 F.Supp. 486 (E.D.Wis.1979), who quoted language from an oral decision, Sala v. County of Suffolk (E.D.N.Y. Nov. 28, 1978) (unpublished decision), describing strip searches involving the visual inspection of the anal and genital areas as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission ...." 479 F.Supp. at 491. The testimony given by the plaintiffs-appellees in the district courts here ratifies this description. Even the Supreme Court has stated that a strip search and visual inspection "instinctively gives us the most pause." Bell v. Wolfish, 441 U.S. at 558, 99 S.Ct. at 1884; see also 441 U.S. at 576-77, 99 S.Ct. at 1892 (Marshall, J., dissenting) ("the body cavity searches of MCC inmates represent one of the most grievous offenses against personal dignity and common decency"); 441 U.S. at 594, 99 S.Ct. at 1902 (Stevens, J., dissenting) ("The body-cavity search--clearly the greatest personal indignity--may be the least justifiable measure of all [the security practices at the institution]."). In short, we can think of few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here.
 
 
 29
 Balanced against this invasion of personal privacy is the governmental interest in conducting the particular searches in question. 441 U.S. at 559, 99 S.Ct. at 1884. In these cases, the governmental interest alleged by the City to justify these particular strip searches was the need to maintain the security of the City lockups by preventing misdemeanor offenders from bringing in weapons or contraband; the need was apparently felt to be so great that women misdemeanants were strip searched even when there was no reason to believe they were hiding weapons or contraband on their persons.
 
 
 30
 The evidence the City offered to demonstrate the need for requiring strip searches of women minor offenders to maintain jail security, however, belies its purported concerns. The affidavits of the lockup personnel, which lack specificity, suggest that only a few items have been recovered from the body cavities of women arrested on minor charges over the years. In the only analytical survey submitted by the City, conducted over a thirty-five day period in June and July of 1965, all of the items found in the body orifices[9] of the 1,800 women searched during that period were taken from women charged with either prostitution (7 items), assault (1 item), or a narcotics violation (1 item) (Ex. 7). These are the kinds of crimes, unlike traffic or other minor offenses, that might give rise to a reasonable belief that the woman arrestee was concealing an item in a body cavity. Although a detention center may be a place "fraught with serious security dangers," Bell v. Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884, the evidence does not support the view that those dangers are created by women minor offenders entering the lockups for short periods while awaiting bail. Here, the "need for the particular search," id., a strip search, is hardly substantial enough, in light of the evidence regarding the incidence of weapons and contraband found in the body cavities of women minor offenders, to justify the severity of the governmental intrusion.
 
 
 31
 Balancing the citizen's right to be free from substantial governmental intrusions against the mission of law enforcement personnel to ensure a safer society is often a difficult task. While the need to assure jail security is a legitimate and substantial concern, we believe that, on the facts here, the strip searches bore an insubstantial relationship to security needs so that, when balanced against plaintiffs-appellees' privacy interests, the searches cannot be considered "reasonable." Logan v. Shealy, 660 F.2d 1007 (4th Cir.1981), cert. denied, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). The reasonableness standard usually requires, "at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (footnotes omitted). The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted. Terry v. Ohio, 392 U.S. 1, 18 n. 15, 88 S.Ct. 1868, 1878 n. 15, 20 L.Ed.2d 889 (1968). Based on these principles, we agree with the district court in Jane Does that ensuring the security needs of the City by strip searching plaintiffs-appellees was unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed. Doe v. Renfrow, 631 F.2d 91, 93 (7th Cir.1980) (per curiam), cert. denied, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) (strip search of a minor student without reasonable cause to believe she possessed contraband on her person violates "any known principle of human decency" and "exceed[s] the 'bounds of reason' by two and a half country miles"); Tinetti v. Wittke, 620 F.2d 160 (7th Cir.1980) (per curiam) (strip searches of persons arrested and detained overnight for nonmisdemeanor traffic offenses without probable cause to believe that detainees are concealing contraband or weapons on their bodies are unconstitutional). Accordingly, because the court and jury below could reasonably conclude that the strip search policy of the City as applied in these cases was unreasonable under the fourth amendment, we uphold their determinations on this issue.
 
 
 32
 B. Equal Protection Ground.
 
 
 33
 The policy of the City of Chicago under which female arrestees were routinely subjected to strip searches while similarly situated males were not established a significant disparity in treatment based on gender. Accordingly, the policy is subject to scrutiny under the equal protection clause of the fourteenth amendment, which requires that the party seeking to uphold a policy that expressly discriminates on the basis of gender must carry the burden of showing an "exceedingly persuasive justification" for the differing treatment. Mississippi University for Women v. Hogan, --- U.S. ----, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). The burden is met "only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' " Id. (quoting Wengler v. Druggists Mutual Insurance Co., 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980)); Personnel Administration of Massachusetts v. Feeny, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979). For the reasons that follow, we believe the City has failed to carry its burden.
 
 
 34
 The City argues initially that the strip searches conducted on women were no more intrusive than the thorough hand search used on men and that both sexes were therefore subjected to equal treatment. This assertion runs contrary to common experience. As we have already observed, the visual cavity searches conducted by the City are one of the more humiliating invasions of privacy imaginable, and we find those searches to be substantially more intrusive than the thorough hand searches.
 
 
 35
 The City also argues that the strip searches of women detainees served the important governmental interest of ensuring the integrity and safety of the City lockups. It maintains that the decision to search men and women differently was not arbitrary but based on the documented ability of women arrestees to secrete weapons and contraband in the vaginal cavity and the inability to discover such items by a thorough hand search. The City introduced several affidavits of security personnel and one statistical survey in an attempt to show that weapons and contraband can be and have been concealed in the vagina. Although the affidavits lacked specificity, the district court in Jane Does concluded that, for the purpose of summary judgment, the documents demonstrated that weapons can be concealed on or within the body cavities of females. The court also concluded, however, that the evidence also showed that weapons can be secreted on or within the bodies of males. It thus found that the policy of the City under which only the body cavities of female, but not male, arrestees were visually inspected violated the women's rights to equal protection.
 
 
 36
 The problem with the City's position, of course, is that it has failed to show why the presence of the vaginal cavity made it necessary to strip search only women to achieve its objective of ensuring the security of the City lockups and unnecessary to search the body cavities of males, which can be and occasionally are used to conceal weapons or contraband.[10] The equal protection clause, of course, does not proscribe gender as a basis for classification when the situations of men and women are in fact different. Michael M. v. Superior Court of Sonoma County, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981). Here, however, the City has failed to show that men and women minor offenders are not similarly situated. Nowhere has the City demonstrated that the incidence of items found in the vaginal cavities of women was so much greater than that associated with items secreted in the anal cavities of men to justify the grossly disparate search treatment. Because the City has offered no comparative data to suggest that women arrested for minor offenses conceal items in their vaginas to such a degree as to justify strip searching only women and not men arrested for similar offenses, it cannot show a "substantial relation between the disparity and an important state purpose." Lehr v. Robertson, --- U.S. ----, 103 S.Ct. 2985, 2996, 77 L.Ed.2d 614 (1983). Under these circumstances, we must agree with the district court in Jane Does that the City has not met its burden of demonstrating that the difference in gender alone justified the disparate search treatment accorded men and women. We therefore affirm the decisions below on the additional ground that the strip search policy instituted by the City violated the equal protection clause of the fourteenth amendment.III. JURY AWARDS
 
 
 37
 The City argues that the jury awards in each of the cases before us are excessive and that we should order remittiturs. The awards for plaintiffs-appellees Mary Beth G. and Sharon N. were $25,000 each, while plaintiff-appellee Mary Ann Tikalsky received $30,000. The remaining plaintiff-appellee, Hinda Hoffman, received an award of $60,000. In determining whether an award is excessive, we are to accord substantial deference to the decision of the jury and will not disturb an award unless we are convinced that it is "monstrously excessive" or "so large as to shock the conscience of the court." Huff v. White Motor Corp., 609 F.2d 286, 296 (7th Cir.1979); Galard v. Johnson, 504 F.2d 1198, 1199 (7th Cir.1974).
 
 
 38
 After having carefully appraised the evidence bearing on damages, we believe that the evidence submitted by each of the plaintiffs-appellees is sufficient to support the awards. The testimony offered by each woman regarding emotional and mental distress resulting from the searches was adequately corroborated by persons who knew the women best. The testimony revealed, inter alia, instances of shock, panic, depression, shame, rage, humiliation, and nightmares, with lasting effects on each woman's life. Under these circumstances, we are not in a position to second guess the juries' findings on the actual measurement of damages. Whitley v. Seibel, 676 F.2d 245 (7th Cir.1982).
 
 
 39
 We recognize that while three of the awards are generally consistent with one another, the award of $60,000 to plaintiff-appellee Hinda Hoffman is at least twice as great as the others. In the past, we have sometimes reduced damage awards when they have been out of line with a clear trend of awards at lesser amounts. See, e.g., Phillips v. Hunter Trails Community Association, 685 F.2d 184 (7th Cir.1982) (housing discrimination award of $25,000 made by trial judge reduced to $10,000 in part because original award was more than twice as much as received by any other victim of housing discrimination for intangible injuries in litigation over a 14 year period). Here, the award is greater than most other awards given by the juries for damages in similar strip search cases involving the City of Chicago so as to be out of step with nascent trends, although at least one award has gone nearly as high.[11] One explanation for the higher award may be that plaintiff-appellee Hoffman alleged aggravating circumstances associated with the strip search that the jury was free to find as having been proximately caused by the policy of the City and therefore compensable against it. Plaintiff-appellee Hoffman testified that two male police officers were within view when she was strip searched, and that a group of prostitutes jeered at her as the search was conducted. A jury could reasonably infer that the magnitude of plaintiff-appellee Hoffman's intangible injuries were significantly affected by these circumstances. Still, at least one of the other plaintiffs-appellees also believed she was being viewed by male police personnel while she was being searched, Brief of Plaintiff-Appellee Mary Beth G. at 4, and the manifestations of plaintiff-appellee Hoffman's psychic and emotional injuries do not appear to us to be significantly different from those of the other plaintiffs-appellees; the record reveals that each woman described the emotional and psychic effect of the search in similar language, each woman still thinks about the strip search, and each woman's attitudes and relationships with others have been colored by the experience. In addition, some elements of plaintiff-appellee Hoffman's claimed damages appear at least tenuous when measured against the usual damage standard of causation and foreseeability. For example, her own evidence discloses that part of her distress resulted from her dissatisfaction with the way her brother, an attorney, responded to her situation and handled her traffic violation case; despite her insistence that her brother tell the traffic judge about her strip search, her brother thought it best not to mention the incident. Even her breakup with her boyfriend six months after the strip search was attributed to the search, although her boyfriend testified that it was hard from him to say exactly what caused the breakup.
 
 
 40
 Despite this not uncommon attempt to load every injury possible onto the back of the wrong in an effort to increase the damage award, there nonetheless remains in this case, considering the nature of the constitutional wrong suffered, sufficient evidence of humiliation and mental distress to support the jury's damage award. Whatever misgivings we may have about the size of the award to plaintiff-appellee Hoffman must give way to our recognition of the function of the jury as the primary finder of fact. The jury is the collective conscience of the community, and its assessment of damages must be given particular weight when intangible injuries are involved. Although a jury's perceptions may vary from our own, we will not disturb its assessment of compensatory damages "unless in our judgment it can aptly be described as 'grossly excessive' or 'monstrous' or with similar perjorative adjectival terms." Huff, 609 F.2d at 297. Thus, although the amount awarded to plaintiff-appellee Hoffman is significantly greater than the amount awarded to the other plaintiffs-appellees, it is not so "grossly excessive" under these particular circumstances as to require a reduction. Accordingly, we affirm the amount of the verdicts in each of these cases.
 
 IV. ATTORNEY'S FEES AND COSTS
 
 41
 Plaintiff below Mary Ann Tikalsky cross-appeals from the decision of the district court regarding plaintiff's motion for an allowance of attorney's fees. Tikalsky v. City of Chicago, No. 78 C 3260 (N.D.Ill. March 30, 1983). The motion was brought pursuant to 42 U.S.C. Sec. 1988 (1976), which authorizes a court in its discretion to grant reasonable attorney's fees as part of the costs to all "prevailing parties" in a section 1983 action.[12] Both plaintiffs and defendants may be considered "prevailing parties" for purposes of section 1988, although the standard for defendants is different from that for plaintiffs.
 
 
 42
 The district court rejected plaintiff's request for attorney's fees for the whole trial, which amounted in plaintiff's estimate to $146,568.75.[13] In reaching this conclusion, the court relied on the fact that plaintiff had prevailed on only one of her three claims. Plaintiff's original complaint, filed on August 16, 1978, charged two Chicago police officers with false arrest and excessive force in connection with plaintiff's arrest for disorderly conduct. The complaint was subsequently amended on June 15, 1979, to include a third count alleging various constitutional violations relating to the strip search of plaintiff. Named as additional defendants were the City of Chicago and other personnel of the Chicago Police Department. The jury returned a verdict in favor of the arresting officers on the false arrest and excessive force claims and in favor of all of the defendants except the City and one individual defendant on the strip search claim. The verdict against the individual defendant was subsequently dismissed by the court.
 
 
 43
 The district court considered our decision in Lenard v. Argento, 699 F.2d 874 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983), to be the guide for determining what fees are available to a prevailing plaintiff. In that case, we stated that "attorney's fees should be awarded only for the preparation and presentation of claims on which the plaintiff has prevailed. '[T]he amount of attorney's fees they receive [prevailing plaintiff] should be based on the work performed on the issues in which they were successful.' " Id. at 899 (quoting Nadeau v. Helgemoe, 581 F.2d 275, 279 (1st Cir.1978)). The district court termed "preposterous" plaintiff's argument that the issues raised by the false arrest and excessive force counts were so intertwined with the issues relating to the strip search that plaintiff should have attorney's fees awarded to her for the whole trial. The court also found, without explanation, that the individual defendants were "prevailing parties" under the statute and that the amount plaintiff was entitled to recover in attorney's fees from the City was equal to the amount in attorney's fees that all of the defendants except the City were entitled to recover from plaintiff:
 
 
 44
 The Court finds that those amounts are equal. It is utterly impossible for the Court to identify item by item and hour by hour the amount of attorney's fees due for each of the parties hereto. This case has been before this Court for all of the discovery and preliminary proceedings as well as the whole trial, and the Court is of the opinion that the plaintiff and defendants, except the City of Chicago, should both have the same amount of attorney's fees assessed against them.
 
 
 45
 Tikalsky v. City of Chicago, No. 78 C 3260, slip op. at 14-15 (N.D.Ill. March 30, 1983). Recognizing that the City would ultimately receive any fees paid by plaintiff to the individual defendants and that this amount would equal the amount the City would pay to plaintiff, the trial court assessed no attorney's fees against any party in connection with the district court proceedings. The court also denied fees to plaintiff for work on the petition for mandamus compelling the trial court to set aside its order for a new trial for the City. However, the court did permit plaintiff to recover $2,000 for attorney's fees because of her success on the appeal of the district court's order granting a new trial to the City. The court based this amount on "[the court's] knowledge of how much time would be required for preparing an interlocutory appeal and arguing the same before the Court of Appeals." Id. at 16. In addition, the court awarded court costs to plaintiff in the amount of $2,426.85.
 
 
 46
 Plaintiff maintains that the district court committed the following legal errors: (1) it awarded attorney's fees to counsel for each of the individual defendants (i.e., all defendants except the City of Chicago); (2) it discounted plaintiff's request for time spent litigating the liability of the defendants in supervisory capacities on the strip search claim; (3) it denied plaintiff fees for work on the petition for mandamus; (4) it awarded fees for the appeal without regard to plaintiff's time sheets. Brief of Plaintiff-Appellant (Tikalsky) at 27-28. Plaintiff also contends that the district court failed to properly exercise its discretion in adjusting the rates and hours of plaintiff's attorneys and in awarding only certain costs.
 
 
 47
 We will discuss separately the award of attorney's fees to the individual defendants, the award of attorney's fees to plaintiff, and the award of only certain costs to plaintiff. We review the district court's actions only for abuse of discretion. Sanchez v. Schwartz, 688 F.2d 503 (7th Cir.1982).
 
 
 48
 A. Award Of Attorney's Fees to the Individual Defendants.
 
 
 49
 For a defendant to be considered a "prevailing party" and entitled to attorney's fees under 42 U.S.C. Sec. 1988 (1976), the court must find that the plaintiff's action was "vexatious, frivolous, or brought to harass or embarrass the defendant." Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 1937 n. 2, 76 L.Ed.2d 40 (1983); Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980); Badillo v. Central Steel & Wire Co., 717 F.2d 1160 at 1163 (7th Cir.1983). Although the plaintiff's subjective bad faith is not a prerequisite to a fee award in favor of the defendant, the merit of the plaintiff's claim should be judged without regard to the fact that the plaintiff has lost on it. Only actions that are groundless or without foundation will give rise to an attorney's fee award for the defendant. Hughes v. Rowe, 449 U.S. at 14, 101 S.Ct. at 178.
 
 
 50
 The district court found that "in this case the facts are such that all of the defendants except the City of Chicago are entitled to recover attorney's fees against the plaintiff." Tikalsky v. City of Chicago, No. 78 C 3260, slip op. at 14 (N.D.Ill. March 30, 1983). The court did not explain what "the facts" were that led to its conclusion that the individual defendants were entitled to attorney's fees, nor did it refer to the legal standard for awarding attorney's fees to defendants. In reaching its conclusion, however, the district court necessarily held, albeit implicitly, that plaintiff's false arrest and excessive force claims against the arresting officers and her strip search claim against the defendants other than the City were without foundation.
 
 
 51
 In order to facilitate review of district judges' discretion in awarding attorney's fees, it is necessary that the district judge "make sufficient factual findings to enable the appellate court to track his decision." Sanchez v. Schwartz, 688 F.2d 503, 506 (7th Cir.1982). See also Hensley v. Eckerhart, 103 S.Ct. at 1941 ("It remains important ... for the district court to provide a concise but clear explanation of its reasons for the fee award."). The district judge made no finding that plaintiff's claims against the individual defendants were frivolous, unreasonable, or without foundation. Under these circumstances, we cannot say that the district court properly "exercised its discretion squarely within the permissible bounds of [the statute]." Christianburg Garment Co. v. Equal Employment Opportunity Commission, 434 U.S. 412, 424, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978).
 
 
 52
 We find it unnecessary, however, to issue a remand so that the district court can explain why the facts, when judged against the appropriate legal standard, warrant recovery of attorney's fees by each of the individual defendants. Only recently we observed that generally cases in which fees have been assessed against a plaintiff "have been limited to situations where plaintiff's conduct was abusive, or merely a disguised effort to harass or embarrass the defendant." Badillo v. Central Steel & Wire Co., 717 F.2d 1160 at 1164. We cannot say, after a thorough review of the record, that plaintiff's conduct in bringing these three claims arose to such a level; the facts simply cannot support a conclusion that plaintiff's claims against the individual defendants were unreasonable, vexatious, or frivolous. Hughes v. Rowe, 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). Accordingly, we reverse the judgment of the district court awarding attorney's fees to the individual defendants.
 
 
 53
 B. Award of Attorney's Fees to Plaintiff.
 
 
 54
 A plaintiff will be considered a "prevailing party" and entitled to reasonable attorney's fees under section 1988 if the plaintiff has succeeded " 'on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing the suit.' " Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir.1978)). That has been the standard adopted in this circuit, Lenard v. Argento, 699 F.2d 874, 899 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983); Busche v. Burkee, 649 F.2d 509, 521 (7th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), and we believe the district court correctly applied it in this case. The plaintiff was successful on her central claim for relief and thus is entitled to reasonable attorney's fees.
 
 
 55
 The considerations for determining the amount of reasonable attorney's fees were only recently described by the United States Supreme Court in Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a case decided after the district court here issued its opinion. In determining what constitutes a reasonable attorney's fee, the trial judge is to have considerable discretion. Certain adjustments, however, are required as a matter of law. One of these requirements, announced in Hensley, is that if the plaintiff has succeeded on only some of his or her claims for relief, the plaintiff may not recover fees for time expended on "distinctly different claims for relief that are based on different facts and legal theories" than the successful claims. 103 S.Ct. at 1940. Work on unsuccessful, unrelated claims for relief
 
 
 56
 cannot be deemed to have been "expended in pursuit of the ultimate result achieved." Davis v. County of Los Angeles, 8 E.P.D. p 9444, at 5049 (CDCal.1974). The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.
 
 
 57
 Id. (footnote omitted).
 
 
 58
 Because Hensley only disapproves of awarding attorney's fees for time spent on unsuccessful claims for relief that are unrelated to successful claims, however, time spent on unsuccessful, related claims may be compensated.[14] 103 S.Ct. at 1940. Hensley recognizes that "there is no certain method of determining when claims are 'related' or 'unrelated.' " Id. at 1941 n. 12. The case instructs, however, that the starting point for separating an unrelated, unsuccessful claim from a related, unsuccessful claim is to determine whether a particular unsuccessful claim shares a "common core of facts" with the successful claim or is based on a "related legal theory."[15] Id. We believe a useful tool for making this determination is to focus on whether the claims seek relief for essentially the same course of conduct. Under this analysis, an unsuccessful claim will be unrelated to a successful claim when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised.
 
 
 59
 We believe that plaintiff's unsuccessful false arrest and excessive force claims requested relief for courses of conduct independent of plaintiff's strip search claim. The first two claims requested relief only from the two arresting officers, not from the City, for damages flowing from the conduct surrounding the arrest itself; the challenged conduct was that the arrest was undertaken without probable cause and was accomplished with excessive force. The strip search claim, on the other hand, challenged only the conduct relating to the search, namely, that the strip search was constitutionally unreasonable and discriminatory. Because the relief requested on the false arrest and excessive force claims corresponds to courses of conduct "distinctly different" from that relating to the strip search claim, the hours spent on these unsuccessful claims must be excluded in considering the amount of a reasonable attorney's fee.[16] 103 S.Ct. at 1943. We therefore uphold the district court's determination that no fees should be awarded for time spent on the unsuccessful and unrelated false arrest and excessive force claims for relief.[17]
 
 
 60
 We believe the district court erred, however, in not allowing plaintiff to recover fees for the time spent litigating the strip search claim against the individual defendants. Regardless which of the various definitions of "claim" courts adopt for use in the attorney's fees context,[18] we believe that the award of attorney's fees for time expended in remedying illegal conduct should not turn on whether only some or all of the defendants named in connection with the conduct are ultimately held liable. Hensley clearly permits attorney's fees to be awarded for time spent relating to matters not "distinctly different" from those on which the plaintiff ultimately succeeds. When defendants are not named frivolously in connection with the same illegal conduct, it follows that the matters involving the different defendants will always be "related." Here, for example, plaintiff's strip search claim sought relief for the same constitutionally infirm course of conduct vis-a-vis the individual defendants as the City. The only difference in the tenor of the claim against the individual defendants was that the individual defendants were sued under a different standard of liability than the City.
 
 
 61
 Although the Supreme Court in Hensley did not specifically address situations in which a plaintiff brings a claim against several defendants but obtains relief from only some of them, we have already observed that the Court's discussion of awards of attorney's fees is structured in terms of compensable "claims for relief."[19] This language suggests that all time spent in pursuit of relief for the same illegal conduct should be considered in awarding attorney's fees once the relief sought is obtained, regardless whether the plaintiff has succeeded in obtaining the relief from only some and not all of the defendants named in connection with the conduct. Once the relief sought is obtained, the plaintiff will have succeeded. It would therefore be illogical to define compensable "claims for relief" in terms of defendants, because once the plaintiff's claim succeeds against one defendant, the plaintiff will have achieved full relief for the illegal course of conduct notwithstanding the plaintiff's failure to obtain relief from each and every defendant. A recovery against more than one of the defendants will not enhance the amount of the damage award. We hold that when, as here, a plaintiff raises a claim for relief that relates to several defendants, not all of whom are held liable, the total time expended on the claim for relief should be counted in awarding the plaintiff attorney's fees so long as the defendants from whom plaintiff did not obtain relief were not named frivolously. In these circumstances, the total time expended on the claim can thus be said to have been "in pursuit of the ultimate result achieved" of obtaining relief on the claim, 103 S.Ct. at 1940 (quoting Davis v. City of Los Angeles, 8 E.P.D. p 9444, at 5049 (C.D.Cal.1974)), and it matters not that the plaintiff was unsuccessful as to some of the defendants. The plaintiff will have obtained all the relief sought in connection with the illegal conduct.
 
 
 62
 We have already determined that plaintiff's strip search claim against the individual defendants was not brought frivolously; plaintiff should therefore be compensated by the City for all time expended in litigating the strip search claim, since the plaintiff was completely successful in obtaining relief for the illegal conduct connected with the claim.[20] Services at all stages of the litigation on this claim are compensable, including time expended on the petition for mandamus, since that effort was intimately connected with the interlocutory appeal of the new trial order on which plaintiff was successful. See Tikalsky v. City of Chicago, Nos. 81-1492, 81-8071 (7th Cir. Nov. 2, 1981) (Order).
 
 
 63
 Because the district court has a "superior understanding of the litigation," Hensley v. Eckerhart, 103 S.Ct. at 1941, and can best assess the experience and skill of plaintiff's attorneys, we remand the case to the district court for recalculation of the award in light of the views expressed above. The determination of the amount of reasonable attorney's fees is left to the sound discretion of the district court. We offer but a few more guidelines. As we suggested in Muscare v. Quinn, 614 F.2d 577, 581 (7th Cir.1980), the court might well begin by determining the number of hours actually worked that were reasonably necessary to the successful claim, thereby excluding excessive or redundant time, and then multiplying this figure by a reasonable hourly rate for each attorney who worked on the case. The reasonableness of the hourly rate "should be measured according to the normal rate in the legal community for substantially similar work by competent practitioners." McCann v. Coughlin, 698 F.2d 112, 130 (2d Cir.1983). The resulting amount can then be adjusted according to several factors, see Hensley v. Eckerhart, 103 S.Ct. at 1937 n. 3; Johnson ex rel. Johnson v. Brelje, 701 F.2d 1201, 1212 (7th Cir.1983), including the experience of the attorneys, the difficulty of the questions presented, the customary fee, and whether the fee is fixed or contingent. In particular, Hensley emphasizes that courts must give considerable attention to "the relationship between the extent of success and the amount of the fee award," 103 S.Ct. at 1942, especially when the plaintiff has succeeded on only some of his or her claims. If the trial court determines that the amount of the fee after the initial calculations is "unreasonable" in light of the level of success, then it should make an upward or downward adjustment. Finally, the court should provide a clear explanation of its reasons for the amount of the award it grants. Here the district court gave an explanation for some of its findings but failed to discuss others adequately.
 
 
 64
 C. Award of Costs to Plaintiff.
 
 
 65
 Plaintiff Tikalsky also asserts that the district court abused its discretion in failing to award her certain costs she requested.[21] She requests reimbursement for all of the costs that she incurred pursuant to Rule 54(d), Fed.R.Civ.P.,[22] and pursuant to 28 U.S.C. Sec. 1920 (1976 & Supp. IV 1980)[23] and 42 U.S.C. Sec. 1988 (1976).[24] These costs are awarded to the prevailing party. Lenard v. Argento, 699 F.2d 874, 900 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). In reviewing the district court's determinations, we are to focus first on whether the expenses are recoverable "costs" and second on whether the costs are reasonable, both in amount and necessity. Illinois v. Sangamo Construction Co., 657 F.2d 855, 864 (7th Cir.1981). We have observed that "[o]ur inquiry is much broader with respect to the first question than the second," because "the trial court is in the best position to determine the reasonableness of the cost." Id.
 
 
 66
 We believe that each of the expenses the district court denied--charges by the official court reporter, certain expenses relating to the depositions of five of the defendants, and exemplification expenses--are all recoverable "costs" under the applicable provisions. See, e.g., Illinois v. Sangamo Construction Co., 657 F.2d at 867; Lenard v. Argento, 699 F.2d at 900. However, we are unable to review whether the costs denied were unreasonable costs because the district court failed to make any such findings. The court gave no reasons whatsoever for its decision to deny the costs requested here. However, we need not remand this issue to the district court; after examining all of the facts and after assessing plaintiff's arguments, to which the City did not respond in its brief or at oral argument, we believe the costs requested by plaintiff were reasonable and were necessary to plaintiff's litigation of the case. Accordingly, we reverse the determination of the district court denying the costs.
 
 V. SUMMARY
 
 67
 The judgments and damage awards against the City in Nos. 82-1894 (Mary Beth G.), 82-1920 (Sharon N.), 82-2605 (Tikalsky), and 83-2203 (Hoffman) are affirmed. The judgment in No. 83-1618 (Tikalsky) respecting the award of attorney's fees to the individual defendants is reversed; the judgment in No. 83-1618 (Tikalsky) respecting the award of attorney's fees to plaintiff-appellant is vacated and the case is remanded to the district court to award plaintiff-appellant reasonable attorney's fees for all time expended in connection with the strip search claim for relief; the judgment in No. 83-1618 (Tikalsky) denying plaintiff-appellant certain costs is reversed. The City shall bear the costs of these appeals.
 
 
 
 *
 The Honorable Edward R. Neaher, Senior District Judge for the Eastern District of New York, is sitting by designation
 
 
 [1]
 Prior to this stipulation and agreement, the disclosure of the strip search policy of the City moved the Illinois legislature to amend the Illinois statute governing "Rights on Arrest" to prohibit strip searches of persons arrested for traffic, regulatory, or misdemeanor offenses absent a reasonable belief that the arrestee is concealing weapons or controlled substances on his or her person. Ill.Rev.Stat. ch. 38, Sec. 103-1(c) (eff. Sept. 2, 1979)
 
 
 [2]
 Mary Beth G. and Sharon N. were stopped for traffic violations; they were arrested and taken to detention centers because there were outstanding parking tickets on their cars. Hinda Hoffman was stopped for making an improper left turn and was arrested and taken to the police station when she failed to produce her driver's license. These plaintiffs-appellees were all members of the proposed plaintiff class in the Jane Does v. City of Chicago case. The definition of the proposed class was:
 all female persons who were detained by the CPD [Chicago Police Department] for an offense no greater than a traffic violation or a misdemeanor, including all females who were never charged with any offense and who were subjected to a strip search in situations where there was no reason to believe that weapons or contraband had been concealed on or in their bodies. (R. 1, pp. 2-3).
 The district court found that the class met the requirements for certification under Rule 23(b)(2) but not 23(b)(3), Fed.R.Civ.P. 23. Therefore, the damages issue did not proceed as a class action, but rather by individual trials for damages. (R. 44).
 Plaintiff-appellee Tikalsky was arrested on a charge of disorderly conduct, which was subsequently dismissed, and brought to the women's lockup at the police station.
 
 
 [3]
 The specific facts surrounding the searches of each plaintiff-appellee vary. Each woman, however, was subjected to a strip search that included the admitted procedures of the official City policy
 
 
 [4]
 In the description of the policy given by the City, the City claims that all searches were conducted in a closed room away from the view of all persons except the person conducting the search. Defendant's Brief (Tikalsky) at 14. This portion of the description was variously contradicted by the testimony of plaintiffs-appellees. We need not consider these additional allegations, however, because we believe the policy even as described is unconstitutional for the reasons we explain
 
 
 [5]
 Section 18 of the Bill of Rights of the Illinois Constitution of 1970 (Ill. Const. (1970), art. I, sec. 18) provides:
 The equal protection of the laws shall not be denied or abridged on account of sex by the State or its units of local government and school districts.
 
 
 [6]
 Commentators have recognized that the "reasonableness" requirement extends to both the scope and the intensity of the search. See generally Shuldiner, Visual Rape: A Look at the Dubious Legality of Strip Searches, 13 J.Mar.L.Rev. 273 (1980); Dix, Means of Executing Searches and Seizures as Fourth Amendment Issues, 67 Minn.L.Rev. 89 (1982)
 
 
 [7]
 Another case cited by the City, United States v. Klein, 522 F.2d 296 (1st Cir.1975), in which a visual rectal search conducted incident to arrest was found to be constitutional, is also distinguishable. In Klein, the arrestee was arrested for distribution of cocaine. We have previously upheld such searches conducted under similar circumstances, Salinas v. Breier, 695 F.2d 1073 (7th Cir.1982) (limited strip search and visual inspection conducted incident to valid arrest is permissible when there is probable cause to believe the arrestee is hiding a controlled substance on his or her person), and the district court in the Jane Does cases specifically noted in dictum that such circumstances would provide reasonable suspicion sufficient to justify a strip search and visual inspection, Jane Does v. City of Chicago, No. 79 C 789, slip op. at 8 (N.D.Ill. Jan. 12, 1982). In the cases here, however, plaintiffs-appellees are only misdemeanor offenders and there was no reasonable belief that any of them were secreting contraband on their persons
 
 
 [8]
 The majority in Wolfish indicated that strip searches conducted after contact visits could serve as an effective deterrent to the importation of weapons or contraband. No deterrence effect could have resulted from the strip search policy of the City, however, because none of the women were aware that such a policy even existed
 
 
 [9]
 The survey does not detail in which body orifice the items found were concealed
 
 
 [10]
 The decisional literature readily confirms this fact. See, e.g., United States v. Park, 521 F.2d 1381 (9th Cir.1975); Daugherty v. Harris, 476 F.2d 292 (10th Cir.), cert. denied, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); Huguez v. United States, 406 F.2d 366 (9th Cir.1968); Hodges v. Klein, 412 F.Supp. 896 (D.N.J.1976)
 
 
 [11]
 Compare Susan B. v. City of Chicago, 83 C 228 (N.D.Ill. Nov. 16, 1983) ($15,000 verdict); Stella S. v. City of Chicago, 82 C 1912 (N.D.Ill. Dec. 23, 1983) ($15,000 verdict) with Levka v. City of Chicago, 83 C 2283 (N.D.Ill. Nov. 21, 1983) ($50,000 verdict). See also Sala v. County of Suffolk, 75 C 486 (E.D.N.Y. Judgment Order of Feb. 1981) ($25,000 settlement); Saunders v. City of Orlando, 78-6682 (9th Jud.Cir., Orange Cty., Fla., Oct. 1980) ($50,000 jury award for strip search and false arrest); Harrison v. County of El Paso, EP 82 CA 57 (El Paso, Texas 1983) ($112,500 settlement)
 
 
 [12]
 The Civil Rights Attorney's Fees Award Act of 1976 provides in relevant part:
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 42 U.S.C. Sec. 1988 (1976).
 
 
 [13]
 Plaintiff's request was presented as follows:
 Edward T. Stein (270.80 hrs. x $125/hr.) $ 33,850.00
Cecile Singer ( 12.50 hrs. x $125/hr.) 1,562.50
Mary Rita Luecke (542.40 hrs. x $100/hr.) 54,240.00
Susan Kaplan ( 37.05 hrs. x $100/hr.) 3,705.00
James Strnal ( 43.55 hrs. x $100/hr.) 4,355.00
 -----------
 Subtotal $ 97,712.50
 50% Multiplier x 1.50
 -----------
 Total Fees Plus Multiplier Requested $146,568.75
 
 
 [14]
 By specifically approving an award of attorney's fees for time spent litigating unsuccessful claims for relief that are related to successful claims, Hensley implicitly rejects our opinion in Lenard v. Argento that "attorney's fees should be awarded only for the preparation and presentation of claims on which the plaintiff has prevailed." 699 F.2d at 899
 
 
 [15]
 This bifurcated approach reflects the two-part nature of a "claim," which, under the Federal Rules, is generally understood to comprise "the aggregate of operative facts which give [sic] rise to a right enforceable in the court." Original Ballet Russe, Ltd. v. Ballet Theatre, Inc., 133 F.2d 187, 189 (2d Cir.1943). We recognize, however, that the way courts have used the term "claim" in the attorney's fees context has been less precise than in other areas of the law. Compare Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) ("[H]ad respondents prevailed on only one of their six general claims, for example the claim that petitioners' visitation, mail, and telephone policies were overly restrictive, ... a fee award based on the claimed hours would have been excessive.") with Restatement (Second) of Judgments Sec. 24 comment a (1982) (" 'Claim' in the context of res judicata has never been broader than the transaction to which it related.... The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff....")
 "Claims" in the attorney's fees context are often loosely defined in terms of grounds or theories of recovery or in terms of particular "wrongs" bottomed on the same legal theory. Whichever definition is adopted, however, we note that Hensley's emphasis on "claim for relief" (emphasis added), suggests a useful method for determining the "relatedness" of claims. This method we describe in the text.
 
 
 [16]
 Plaintiff maintains that some hours relating to the false arrest claim should be considered in awarding attorney's fees. Plaintiff argues that if the arrest had been found illegal, the search could be considered an element of damages flowing from it. Brief of Plaintiff-Appellant (Tikalsky) at 33 n. 24
 We agree with the general proposition plaintiff advances. Plaintiff is not advocating that hours relating solely to the false arrest claim be considered, but only time that relates to both the false arrest and strip search claims. "[A]n award of attorney's fees may include 'time spent on unsuccessful claims to the extent such time would have been spent in connection with the successful claims even if the unsuccessful claims had not been brought.' " Johnson ex rel. Johnson v. Brelje, 701 F.2d 1201, 1211 (7th Cir.1983) (quoting Busche v. Burkee, 649 F.2d 509, 521 (7th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)). Consequently, any time spent on assessing and proving the emotional and mental trauma suffered by plaintiff as a result of the strip search, so long as the hours relate to plaintiff's successful strip search claim against the City and are not excessive or duplicative, should be considered in assessing attorney's fees for time spent on that claim. This includes time spent researching damages relating to the strip search that was expended before the complaint was amended to include the strip search claim. Johnston v. Jago, 691 F.2d 283, 287-88 (6th Cir.1982).
 
 
 [17]
 The unsuccessful claims here are unlike those in Hensley, in which the Court, while apparently adopting a narrow view of "claim," see 103 S.Ct. at 1941, appeared to conclude that the unsuccessful claims were "related" to the successful claims, id. All the successful and unsuccessful claims in Hensley challenged the constitutionality of treatment and conditions at a state hospital housing persons involuntarily committed who were considered dangerous to themselves and to others. Id. at 1936 & n. 1. Although the specific facts underlying each claim varied according to the discrete deprivation alleged, id., the claims were related because the plaintiffs pursued them to remedy the same general injurious course of conduct, i.e., the denial of minimally adequate treatment
 
 
 [18]
 See supra note 15
 
 
 [19]
 See supra note 15
 
 
 [20]
 Hensley instructs that if the plaintiff "has obtained excellent results, his attorney should recover a fully compensatory fee." 103 S.Ct. at 1940
 
 
 [21]
 The following list summarizes the costs requested, allowed, and disallowed:
 Description of Cost Requested Allowed Disallowed
 
 
 [1]
 Fees/Clerk $ 15.00 15.00
 
 
 [2]
 Fees/Marshal 18.00 18.00
 
 
 [3]
 Fees/Court Reporter 140.50 140.50
 
 
 [4]
 Fees/Witnesses 202.40 167.40 35.00
 
 
 [5]
 Exemplification Costs 687.35 200.00 486.55
 
 
 [6]
 Deposition Costs 2,757.14 1,975.65 781.49
 
 
 [7]
 Skip Tracer/Defendant 50.00 50.00
 --------- -------- ----------
 Total $3,870.39 2,426.85 1,443.54
 
 
 [22]
 Rule 54(d), Fed.R.Civ.P., provides in part:
 Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs.
 
 
 [23]
 28 U.S.C. Sec. 1920 (1976 & Supp. IV 1980) provides:
 A judge or clerk of any court of the United States may tax as costs the following:
 (1) Fees of the clerk and marshal;
 (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
 (3) Fees and disbursements for printing and witnesses;
 (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
 (5) Docket fees under section 1923 of this title;
 (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.
 
 
 [24]
 See supra note 12