CARNES, Circuit Judge,
concurring specially, in which DUBINA and HULL, Circuit Judges, join:
I concur in all of the Court’s opinion but write separately for two reasons. One is to explicate a holding of the Court, and the other is to offer my views on an issue that was briefed and argued but which the Court does not reach.
I.
In his deposition one of the plaintiffs, Peter Evans, made a number of statements that supported his claims but one statement that was not favorable to his own case. Another witness offered testimony on that specific point that was more favorable to the plaintiffs. The Court correctly holds that for summary judgment purposes we accept a non-movant’s own testimony warts and all, instead of snipping from that testimony the parts that are less favorable than what some other witness says. There is good reason that, as the Court aptly puts it, “[o]ur duty to *1284 read the record in the nonmovant’s favor stops short of not crediting the nonmov-ant’s testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.” Ante at 1278.
The good reason is that, absent some extraordinary circumstance, no reasonable jury would believe that a party was lying when he said something harmful to his own case. Reasonable juries know that is not how human nature, influenced by self-interest, works. And when we" decide whether summary judgment is warranted, we view the evidence in the non-movant’s favor, but only to the extent that it would be reasonable for a jury to resolve the factual issues that way. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (to defeat summary judgment “there must be evidence on which the jury could reasonably find for the plaintiff’); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir.1999) (“[Tjhere must be sufficient evidence on which the jury could reasonably find for the plaintiff ....”); id. (“The nonmovant need not be given the benefit of every inference but only of every reasonable inference.” (language from the district court’s order, attached as Appendix A and adopted by the Court)); Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir.1988) (“The summary judgment standard requires that we resolve all reasonable doubts in favor of the non-moving party, but it does not require us to resolve all doubts in such a manner.” (quotation and ellipsis omitted)).
II.
One of the issues we had the parties brief and orally argue is: “Whether arres-tees who are to be detained in the general jail population can constitutionally be subjected to a strip search only i/the search is supported by reasonable suspicion that such a search will reveal weapons or contraband.” We also received a number of amicus briefs on that issue, some of which were helpful. The opinion for the Court notes that: “Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching — for security and safety purposes — arrestees bound for the general jail population.” Ante at 1278-79. Nonetheless, the Court properly determines that this is not the ease in which to decide that issue. It is not, because the strip searches in this case were undertaken by law enforcement officers looking for evidence of a crime that had been committed, instead of by the officials at the county jail acting for general security reasons.
Even though the issue cannot be decided in this case, I offer my present views on it for whatever they may be worth. This expression comes with the realization that “dicta in our opinions is not binding on anyone for- any purpose,” but also with the hope that this will be one of those occasions in which dicta serves a useful purpose. See McDonald’s Corp. v. Robertson, 147 F.3d 1301, 1314-15 (11th Cir.1998) (Carnes, J., concurring specially).
A.
My present view is that reasonable suspicion is not necessary for a strip search of an arrestee who is to be detained in the general jail population, if that search is conducted pursuant to a generally applicable, reasonable jail policy designed to promote safety and security by guarding against the smuggling of weapons and other contraband into a detention facility. This view is contrary to the current circuit law on the subject, at least insofar as misdemeanor arrestees are concerned. In Wilson v. Jones, 251 F.3d 1340 (11th Cir. *1285 2001), involving the strip search of a misdemeanor arrestee, a panel of this Court held that the county’s strip search policy violated the Fourth Amendment because it did not require reasonable suspicion. Id. at 1342-43; see also Skurstenis v. Jones, 236 F.3d 678, 682 (11th Cir.2000) (upholding a strip search of a misdemeanor arres-tee because there was reasonable suspicion, but stating in dicta that a policy of strip searching all detainees in the absence of reasonable suspicion does not comport with the Fourth Amendment’s requirements).
Our circuit law is the same' as that of every other circuit to address the issue insofar as those detained on non-felony charges are concerned. Each of the other circuits to speak on the matter has concluded that a person arrested on a misdemeanor charge may not be strip searched upon being placed in the general jail population unless there is reasonable suspicion to believe that he is concealing a weapon or other contraband. Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir.1989); Watt v. City of Richardson Police Dep’t, 849 F.2d 195, 198-99 (5th Cir.1988); Weber v. Dell, 804 F.2d 796, 802 (2d Cir.1986); Giles v. Ackerman, 746 F.2d 614, 615 (9th Cir.1984), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir.1999)(en banc); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir.1983); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir.1981). A strong argument can be made that all of those decisions, and our own decision in Wilson, are wrong.[1]
The problem is that all of these decisions seem to read Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), as imposing a requirement of reasonable suspicion for detention facility strip searches. As a majority of the present en banc Court notes, albeit in dicta, neither Bell nor any other Supreme Court decision imposes such a requirement. Ante at 1278-79 (“Never has the Supreme Court imposed such a requirement.”). So, all of the decisions that require reasonable suspicion seem to be based on a false premise.
In misinterpreting the Bell decision, we and other courts have focused on a single sentence of the opinion in that case to the exclusion of virtually everything else it says. In that one sentence the Supreme Court said: “But we deal here with the question whether visual body-cavity in *1286 spections as contemplated by the [facility’s] rules can ever be conducted on less than probable cause.” Bell, 441 U.S. at 560, 99 S.Ct. at 1885 (emphasis omitted). The Court answered “yes,” but neither the question nor the answer compels the conclusion that “less than probable cause” means “reasonable suspicion.” The absence of reasonable suspicion is also “less than probable cause.”
The Supreme Court simply did not say in Bell that before a visual body-cavity inspection can be performed on an arres-tee who is being put into a detention facility there must be reasonable suspicion to believe that detainee is carrying a weapon or other contraband. To infer that requirement from one sentence of the Bell opinion puts more weight on the sentence than it will bear. It also ignores the rest of the majority’s opinion as well as the interpretation of that opinion put forward by Justice Powell in his dissenting opinion, id. at 563, 99 S.Ct. at 1886, an interpretation which went unchallenged by the majority.
Bell involved a class action suit brought by pretrial detainees being held at the federal Metropolitan Correctional Center in New York City. The MCC required all inmates, including pretrial detainees, “convicted inmates who are awaiting sentencing or transportation to federal prison,” “convicted prisoners who have been lodged at the facility under writs of habeas corpus ... issued to ensure their presence at upcoming trials, witnesses in protective custody, and persons incarcerated for contempt,” id. at 524, 99 S.Ct. at 1866, “to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit .with a person from outside the institution,” id. at 558, 99 S.Ct. at 1884.[2]
The pretrial detainees alleged in their complaint that the MCC’s strip search policy violated their Fourth Amendment right to be free from unreasonable searches.[3] The district court agreed, and enjoined MCC from conducting the searches absent individualized probable cause to believe that the detainee was concealing a weapon or other contraband. Id. The Second Circuit affirmed. Id. The question the Supreme Court had before it was this: “whether visual body-cavity inspections as contemplated by the MCC rules can ever be conducted on less than probable cause.” Id. at 560, 99 S.Ct. at 1885. The Supreme Court answered “yes,” after “[b]alaneing the significant and legitimate security interests of the institution against the privacy interests of the inmates.” Id.; see also id. at 559, 99 S.Ct. at 1884.
In striking that balance, the Court weighed “the privacy interests of the inmates,” id. at 560, 99 S.Ct. at 1885 — “the scope of the particular intrusion, the manner in which it is conducted, ... and the place in which it is conducted,” id. at 559, 99 S.Ct. at 1884 — against “the significant and legitimate security interests of the institution,” id. at 560, 99 S.Ct. at 1885. In the end, the Bell Court concluded that those security interests of the detention *1287 facility outweighed the privacy interests of the pretrial detainees. Id.
While the Court did “not underestimate the degree to which these searches' may invade the personal privacy of inmates” or ignore the fact “that on occasion a security guard may conduct the search in an abusive fashion,” id., there was a far more compelling interest on the other side of the scale. As the Court explained: “A detention facility is a unique place fraught with serious' security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.” Id. at 559, 99 S.Ct. at 1884. The Court deemed that a weighty consideration even though the record indicated only one instance in three years “where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person.” Id. at 559, 99 S.Ct. at 1885. The Court believed that fact “may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.” Id.
The Supreme Court in Bell took a categorical approach, deciding whether the detention facility’s strip search policy generally was reasonable under the Fourth Amendment, not whether it was reasonable in an individual ease. See id. at 560, 99 S.Ct. at 1885; see also Hudson v. Palmer, 468 U.S. 517, 538, 104 S.Ct. 3194, 3206, 82 L.Ed.2d 393 (1984) (O’Connor, J., concurring) (citing Bell for the' proposition that “[i]n some contexts, ... the Court has rejected the case-by-case approach to the ‘reasonableness’ inquiry in favor of an approach that determines the reasonableness of contested practices in a categorical fashion”).
The most overlooked part of the Bell decision is Justice Powell’s dissent. He dissented for one and only one reason, which is that the majority did not require reasonable suspicion for conducting the strip searches in that case. His concise dissenting opinion. states in its entirety.:
I join the opinion of the Court except the discussion and holding.with respect to body-cavity searches. In view of the serious intrusion on one’s privacy occasioned by such a search, I think at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case. I therefore dissent on this issue.
Bell, 441 U.S. at 563, 99 S.Ct. at 1886 (Powell, J., concurring in part and dissenting in part). The “searches described in this case” are the strip searches performed on all MCC pretrial detainees, not just those charged with felonies. The detainees who were searched included those charged with misdemeanors or violations, and even those charged with no wrong doing at all but who were being held as witnesses in protective custody. See id. at 524, 99 S.Ct. at 1866.
Justice Powell’s dissenting opinion is evidence that we and other circuits have misread the Bell majority opinion as requiring reasonable suspicion before detainee's can be strip searched. If the Bell majority had held what we and other circuits say it did, there would have been no dissenting opinion from Justice Powell. Granted, it can be risky to place too much reliance on dissenting opinions because they sometimes follow a Chicken Little or doomsday approach, exaggerating the nature and extent of the majority opinion in order to assail it. Justice Powell’s dissent in Bell cannot reasonably be viewed as that type of dissent, however, because its only disagreement with thé majority is about the one specific 'point it raises. If the majority had not permitted strip searches of pretrial detainees without rea *1288 sonable suspicion, Justice Powell would not have dissented at all.
The point is that, from his perspective inside the Court, Justice Powell had a better sense of the majority’s holding in Bell than any circuit court of appeals could, and he understood the holding to permit strip searches without reasonable suspicion. Not only that, but if the majority had not intended to permit strip searches of pretrial detainees without reasonable suspicion, it would have been a simple matter to note that in the opinion in answer to Justice Powell’s pointed statement that the Court was allowing them.
The courts, including our own, that have read a requirement of reasonable suspicion into the Bell decision have misinterpreted a sentence of that opinion. They also have ignored Justice Powell’s dissenting opinion and the majority’s failure to deny the sole point of that dissent. Interpreting the Bell decision as not requiring reasonable suspicion is a fairer reading than interpreting the decision to require it.
B.
The panel in Wilson appears to have interpreted Bell to require reasonable suspicion, at least for strip searches involving non-felony detainees, but it seems to me that under Bell there is a three-step analysis for deciding whether a detention facility’s policy is constitutional. The first step is to determine whether the detention facility has a strip search policy permitting such searches without reasonable suspicion. Id. at 558, 99 S.Ct. at 1884. Absent such a policy, the detention facility does need individualized reasonable suspicion to conduct a strip search on a detainee. See Justice v. City of Peachtree City, 961 F.2d 188, 193 (11th Cir.1992).
If the detention facility does have a policy permitting strip searches without reasonable suspicion, the second step of the Bell analysis is to balance the institutional interests of the facility against the privacy interests of the detainee to determine whether the policy is reasonable under the Fourth Amendment. Bell, 441 U.S. at 560, 99 S.Ct. at 1885. The Supreme Court held in Bell that MCC’s visual body-cavity search policy was “reasonable” under the Fourth Amendment even though there was “only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person.” Id. at 559, 99 S.Ct. at 1885. The Court did so based on testimony from “[cjorrections officials” that “visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution.” Id. at 558, 99 S.Ct. at 1884.
If the detention facility’s security interests outweigh the privacy interests of the detainee,' the third step is to determine whether the strip search was “conducted in a reasonable manner,” which means in compliance with the facility’s reasonable policy. Id. at 560, 99 S.Ct. at 1885.
C.
Usually, it will be simple enough to determine whether the detention facility has a strip search policy (the first step), and whether the policy was followed in a particular case (the third step). Most cases will turn on the second step of the analysis. Our own Wilson decision did, and so did all of the decisions of other circuits that have already been cited. For that reason, the second step of the analysis merits closer attention.
Detention facilities are “unique placets] fraught with serious security dangers.” Id. at 559, 99 S.Ct. at 1884. Many of those who are being detained have been convicted of, or charged with, committing violent felonies. Even as to the other detainees, a *1289 significant percentage have “prior felony criminal histories or gang affiliations, which might make them greater security risks than the charges pending against them indicate[].” Dodge v. County of Orange, 282 F.Supp.2d 41, 48 (S.D.N.Y.2003), rev’d on other grounds 103 Fed.Appx. 688 (2d Cir.2004). That is true of those arrested for misdemeanors as well as those arrested on felony charges.
The gang affiliation of inmates, in particular, is a “serious security risk.” Id. At the county jail involved in the Dodge case there were at least fifty gang members being held on any given day. Id. Not surprisingly, “[g]ang members are often more violent, dangerous, and manipulative than other inmates, regardless of the nature of the charges against them; They are also more likely than other inmates to attempt to coerce family members or to coerce, cajole, or intimidate lesser violators into smuggling contraband into the facility.” Id. (citations omitted).
Contraband poses the greatest security risk for officials , at detention facilities. As one expert explained, “one of the primary objectives of any correctional facility must be to prevent the introduction of ‘contraband’ into a correctional facility due to the dangers that contraband presents in a correctional setting.” Id. at 46 (citing the testimony of George Camp, a leading corrections facility expert and a consultant to forty-eight states on the administration of detention facilities). “Contraband” is “anything that an inmate is not permitted to have in a correctional facility,” including obvious things, like weapons, ammunition, or drugs, and “lesser” items, like money, cigarettes, or “excess prison issue items” (e.g. clothing and linens). Id. at 46-47. Of course, weapons and objects that can be made into weapons pose the most direct and obvious threat to security within a detention facility, and within the courthouses to which the detainees are taken for-hearings or trials.
Non-weapon contraband is also bad because it “can be used by inmates to barter, and thus be held over the heads of other inmates.” Id. at 47. Bartering “tends to disrupt prison operations by allowing certain inmates, or groups of inmates, to exercise authority in competition with correctional staff,” which in turn “increase[s] the level of violence and endanger[s] the health, safety, and well-being of inmates, staff, and civilians in [the] correctional facility.”[4] Id.
Of course, detention facility officials have a legal obligation to ensure, to the extent reasonably feasible, that their facilities are safe not only for those detained but also for those who work there and those who visit. As the Supreme Court has put it, “central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.” Pell v. Procunier, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), quoted in Bell, 441 U.S. at 546-47, 99 S.Ct. at 1878. It is for that reason the Supreme Court has held that “even when an institutional restriction infringes a specific constitutional guarantee,” we must evaluate that practice in light of this central objective. Bell, 441 U.S. at 547, 99 S.Ct. at 1878. “Prison administrators therefore should be accorded wide-ranging deference in the adoption *1290 and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.” Id.
Those who run detention facilities are convinced that strip search policies are essential to maintaining safety in their facilities. Experts agree that strip searches “are the best way to maintain the security level necessai'y for keeping serious and dangerous contraband out” of detention facilities. Dodge, 282 F.Supp.2d at 49. The Supreme Court was convinced of the same thing in Bell, where it concluded that, given the “serious security dangers” present in detention facilities, a policy of conducting visual body-cavity searches on all inmates after any visit with a person from the outside is a reasonable way to stop the “[sjmuggling of money, drugs, weapons, and other contraband” that erode the orderly and safe administration of the facility. Bell, 441 U.S. at 559, 99 S.Ct. at 1884.
Affording considerable discretion to those who have the duty to run detention facilities safely is not an abdication of the judiciary’s responsibility to protect the rights of incarcerated individuals. It is instead a recognition — what the Supreme Court has called a “healthy sense of realism” — that “courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.” Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), quoted in Bell, 441 U.S. at 548 n. 30, 99 S.Ct. at 1879 n. 30. To have judges second-guess detention facility officials about the need for procedures like strip searches is also in tension with the principle that “the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.” Bell, 441 U.S. at 548, 99 S.Ct. at 1879.
For these reasons, a strong argument can be made that the second part of the three-prong Bell analysis favors permitting detention facility administrators to adopt a strip search policy that applies to all arrestees being admitted into the facility. If there is such a policy (the first prong) and if it is not applied in an abusive way (the third prong), there will be no Fourth Amendment violation.
D.
One other point is worth some discussion. In judging the constitutionality of strip searches for detainees, some other circuits draw a distinction between whether the person has been arrested on a felony charge or just for a misdemeanor. Our circuit law is unclear about that. See ante at 1285 n. 1. In any event, I think a strong argument can be made that such a distinction is without constitutional significance and finds no support in the real world of detention.
While Masters v. Crouch, 872 F.2d 1248 (6th Cir.1989), Watt v. City of Richardson Police Department, 849 F.2d 195 (5th Cir.1988), Weber v. Dell, 804 F.2d 796 (2d Cir.1986), Giles v. Ackerman, 746 F.2d 614 (9th Cir.1984), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir.1999)(en banc), Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Cir.1983), and Logan v. Shealy, 660 F.2d 1007 (4th Cir.1981), vary in detail around the edges, the picture they paint is essentially the same: The arrestee is charged with committing a misdemeanor or some lesser violation and, while being admitted to the detention facility, she is subjected to a strip search pursuant to the facility’s policy. The plaintiff sues the officials asserting that the search was unconstitutional because the guards did not have any reasonable basis for believing that she was hiding contraband on her person. *1291 See, e.g., Logan, 660 F.2d at 1009-11. In each cited case, the court of appeals holds that because the plaintiffs were “minor offenders who were not inherently dangerous,” Mary Beth G., 723 F.2d at 1272, detention officials needed “reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest,” Weber, 804 F.2d at 802. Because reasonable suspicion was lacking in each case, the search is held to violate the Fourth Amendment.
The Supreme Court made no distinction in Bell between detainees based on whether they had been charged with misdemeanors or felonies. Instead, the policy that the Court treated categorically, and upheld, provided that “[ijnmates at all Bureau of Prison facilities, including the MCC, are required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution.” Bell, 441 U.S. at 558, 99 S.Ct. at 1884. Among the “[ijnmates at all Bureau of Prison facilities, including the MCC,” were detainees facing only misdemeanor charges, people incarcerated for contempt of court, and witnesses in protective custody who had not been accused of doing anything wrong. See id. at 524 & n. 3, 99 S.Ct. at 1866 & n. 3. The MCC was hardly a facility where all of the detainees were “awaiting trial on serious federal charges,” as some of the opinions of other circuits 'seem to indicate. It is on that basis that they distinguish what they describe as the “exaggerated” need for strip searches at county facilities from- the “real” need at federal facilities. See, e.g., Mary Beth G., 723 F.2d at 1272.[5]
The need for strip searches at county jails is not exaggerated. Employees, visitors, and those who are themselves detained face a real threat of violence, and administrators must be concerned . on a daily basis with the smuggling of contraband on the person of those accused of misdemeanors as well as those accused of felonies. Dodge, 282 F.Supp.2d at 46-49. Even some of the circuits that have required reasonable suspicion for searches of those arrested for misdemeanors concede that there have been instances where contraband was smuggled into.a jail by detainees facing only misdemeanor or lesser charges. See, e.g., Giles, 746 F.2d at 617.
Then there is the fact that gang members commit misdemeanors as well as felonies. In one county jail, for example, fifty percent of those being held on “misdemeanor or lesser charges”* were gang members. Dodge, 282 F.Supp.2d at 48 (citing figures from 2002). “Gang members are often more violent, dangerous, and manipulative than other inmates, regardless of the nature of the charges against them.” Id. Not only that, but “officials at a county jail ... usually know very little about the new inmates they receive or the security risks they present at the time of their arrival.” Id. Moreover, some gang members “attempt to coerce family members or to coerce, cajole, *1292 or intimidate lesser violators into smuggling contraband into the facility.” Id.
These reasons support the expert opinion that all of those who are to be detained in the general population of a detention facility should be strip searched. See id. at 49. The Supreme Court has instructed us that detention facility administrators “should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.” Bell, 441 U.S. at 547, 99 S.Ct. at 1878. It has also explained that “judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular ease, have a better grasp of his domain than the reviewing judge', but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.” Id. at 548, 99 S.Ct. at 1879 (citing Martinez, 416 U.S. at 405, 94 S.Ct. at 1807). Decisions that carve out misdemeanor arrestees for special treatment do not seem to afford those who run detention facilities the “wide-ranging deference” the Supreme Court has mandated.
E.
To summarize, the en banc Court is correct to note that the Supreme Court has never required reasonable suspicion for strip searches of arrestees bound for the general jail population. Ante at 1278-79. The contrary reading of the Supreme Court’s Bell decision that led to the holding in Wilson v. Jones, 251 F.3d 1340 (11th Cir.2001), is mistaken. When we have a case that squarely presents the issue for review, we ought to take it en banc in order to reconsider our Wilson decision.
F.
Judge Barkett suggests that in the process of expressing in this opinion my views, which are critical of the position she stated in the Wilson case, I have violated Article III. Post at 1296 n.l. Her theory is that the statement of dicta in a judicial opinion “intrudes upon the constitutional restraints on the jurisdiction of the federal courts.” Id. This novel theory apparently did not come to mind when she was writing the Wilson opinion broadly enough to invalidate a detention search policy in its entirety even though that case did not present the issue of whether the policy was valid as applied to those arrested on felony charges. See Wilson, 251 F.3d at 1342-43.
The idea that dicta is unconstitutional also must not have come to her mind when Judge Barkett was authoring the opinion of this Court in Aron v. United States, 291 F.3d 708 (11th Cir.2002). The facts in Aron were that the petitioner who sought the benefit of equitable tolling had exercised due diligence before the enactment of 28 U.S.C. § 2255(4), which is the AEDPA’s statute of limitations. Id. at 710. Nonetheless, Judge Barkett purported to “hold” for the Court that “a petitioner’s failure to exercise due diligence.before AEDPA was enacted cannot support a finding that a petition fails to satisfy the timeliness requirement.” Id. at 713. That was classic dicta, as I pointed out in a concurring opinion in Aron. Id. at 716-18 (Carnes, J., concurring). It took this Court only two months to issue an opinion in another case, whose facts did present the pre-AEDPA diligence issue, recognizing that statement on the issue in Aron was dicta and declining for that reason to be bound by it. Drew v. Dep’t of Corrs., 297 F.3d 1278, 1290-92 n. 5 (11th Cir.2002).
To be fair, Judge Barkett is by no means the only member of this Court to sow dicta in her opinions. Indeed, when *1293 one looks for it, dicta appears to be scattered across the opinions of this Court like wildflowers in a spring meadow. A baker’s dozen examples should suffice to prove the point: United States v. Williams, 340 F.3d 1231, 1234-37 (11th Cir.2003) (stating that appellate courts are obliged to apply a “due deference” standard of review to a sentencing judge’s application of the sentencing guidelines to the facts in a particular case, which was recognized as dicta as it related to situations other than a challenge to the district court’s grouping of a defendant’s offenses in United States v. Miranda, 348 F.3d 1322, 1330 n. 8 (11th Cir.2003)); United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th Cir.1999) (stating that “[w]e will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if[, among other things,] ... there is clear evidence of contrary legislative intent,” which was recognized as dicta in CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1227 (11th Cir.2001)); Babicz v. Sch. Bd., 135 F.3d 1420, 1422 n. 10 (11th Cir.1998) (per curiam) (stating that compensatory damages are not available under the Individuals with Disabilities Education Act, which was recognized as dicta in Ortega v. Bibb County Sch. Dist., 397 F.3d 1321, 1326 (11th Cir.2005)); GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir.1998) (stating that a heightened pleading standard applies to all § 1983 actions, which was recognized as dicta in Swann v. S. Health Partners, Inc., 388 F.3d 834, 838 (11th Cir.2004)); United States v. Carter, 110 F.3d 759, 761-62 (11th Cir.1997) (per curiam) (stating that a sentencing judge must give reasons for his ruling on the applicability of the 18 U.S.C. § 3553(a) factors, which was recognized as dicta in United States v. Eggersdorf, 126 F.3d 1318, 1322 & n. 4 (11th Cir.1997)); Grayson v. K Mart Corp., 79 F.3d 1086, 1100 (11th Cir.1996) (stating that the pre-Civil Rights Act statutes of limitations apply to ADEA actions where the challenged conduct occurred prior to the enactment of the Civil Rights Act, which was recognized as dicta in Browning v. AT&T Paradyne, 120 F.3d 222, 225 n. 7 (11th Cir.1997) (per curiam)); Hill v. Dekalb Reg’l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir.1994) (stating that “[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity,” (quotation omitted) which was recognized as dicta in Marsh v. Butler County, Ala., 268 F.3d 1014, 1030 n. 8 (11th Cir.2001)); Vernon v. FDIC, 981 F.2d 1230, 1233-34 (11th Cir.1993) (stating that the common law D’Oench doctrine does not operate “to bar free standing tort claims that are not related to a specific asset acquired by the FDIC,” which was recognized as dicta in both OPS Shopping Ctr., Inc. v. FDIC, 992 F.2d 306, 310 (11th Cir.1993), and Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 597 n. 7 (11th Cir.1995)); United States v. Harris, 990 F.2d 594, 597 (11th Cir.1993) (stating that “it is inappropriate to imprison or extend the term of imprisonment of a federal defendant for the purpose of providing him with rehabilitative treatment,” which was recognized as dicta in United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir.2000) (per curiam)); United States v. Nixon, 918 F.2d 895, 903 n. 6 (11th Cir.1990) (stating that anticipatory search warrants are only appropriate “where the contraband is oh a ‘sure course’ to a known destination,” which was recognized as dicta in United States v. Santa, 236 F.3d 662, 672 n. 14 (11th Cir.2000)); Wilkinson ex rel. Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir.1987) (per curiam) (stating in a Social Security ease that “[i]n order to meet a listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable *1294 listing and the duration requirement,” which was recognized as dicta in Shinn ex rel. Shinn v. Comm’r of Soc. Sec., 391 F.3d 1276, 1285 (11th Cir.2004)); Self v. Great Lakes Dredge & Dock Co., 832 F.2d 1540, 1547 (11th Cir.1987) (stating a rule for contribution and settlement bar in maritime actions for personal injuries,' which was recognized as dicta in Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller, 957 F.2d 1575, 1578 (11th Cir.1992)); and Fairley v. Patterson, 493 F.2d 598, 603-04 (5th Cir.1974) (stating that voters in a district that was less overrepresented than other districts had standing to sue, which was recognized as dicta in Wright v. Dougherty County, Ga., 358 F.3d 1352, 1356 (11th Cir.2004)).
If our own opinions did not demonstrate that the use of dicta is constitutionally permissible, proof positive can be found in the fact that the ultimate arbiter of Article III and all other constitutional provisions not infrequently sows its own opinions with dicta. There are many examples, but an even ten will do: Mertens v. Hewitt Assocs., 508 U.S. 248, 256, 113 S.Ct. 2063, 2069, 124 L.Ed.2d 161 (1993) (stating that restitution is a category of relief that is typically available in equity, which was recognized as dicta in Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 215, 122 S.Ct. 708, 715, 151 L.Ed.2d 635 (2002)); United States v. James, 478 U.S. 597, 605, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (stating that “[i]t is thus clear from [33 U.S.C.] § 702c’s plain language that the terms ‘flood’ and ‘flood waters’ apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control,” which was recognized as dicta and disavowed in Cent. Green Co. v. United States, 531 U.S. 425, 430-31, 121 S.Ct. 1005, 1008-09, 148 L.Ed.2d 919 (2001)); Berkemer v. McCarty, 468 U.S. 420, 439-40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (stating that, in the context of a Terry stop, a detainee is not obliged to respond to questions, which was recognized as dicta in Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 124 S.Ct. 2451, 2459, 159 L.Ed.2d 292 (2004)); Michigan v. Long, 463 U.S. 1032, 1036 n. 1, 103 S.Ct. 3469, 3473 n. 1, 77 L.Ed.2d 1201 (1983) (stating, in the context of a situation where the defendant exited his vehicle before the officers initiated contact, that the officers could have permissibly searched the defendant’s vehicle had they arrested him, which was recognized as dicta in Thornton v. United States, 541 U.S. 615, 124 S.Ct. 2127, 2131, 158 L.Ed.2d 905 (2004)); Bill Johnson’s Rests., Inc. v. NLRB, 461 U.S. 731, 747, 103 S.Ct. 2161, 2172, 76 L.Ed.2d 277 (1983) (stating the standard for the NLRB to use in order to declare a completed lawsuit unlawful under the NLRA, which was recognized as dicta in BE & K Constr. Co. v. NLRB, 536 U.S. 516, 527, 122 S.Ct. 2390, 2397, 153 L.Ed.2d 499 (2002)); Donovan v. Penn Shipping Co., 429 U.S. 648, 649, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977) (per curiam) (stating that “[t]he proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is- ... a matter of federal law,” which was recognized as dicta in Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 447 n. 6, 116 S.Ct. 2211, 2229 n. 6, 135 L.Ed.2d 659 (1996)); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 689, 94 S.Ct. 2080, 2094-95, 40 L.Ed.2d 452 (1974) (stating in a forfeiture case that “it would be difficult to reject the constitutional claim of an owner ... who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property,” which was recognized as dicta in Bennis v. Michigan, 516 U.S. 442, *1295 449-50, 116 S.Ct. 994, 999, 134 L.Ed.2d 68 (1996)); Braden v. 30th Judicial Circuit Court, 410 U.S. 484, 495, 93 S.Ct. 1123, 1130, 35 L.Ed.2d 443 (1973) (stating that “[s]o long as the custodian can be reached by service of process, the court can issue a writ ‘within its jurisdiction’ ... even if the prisoner himself is confined outside the court’s territorial jurisdiction,” which was recognized as dicta in Rumsfeld v. Padilla, 542 U.S. 426, 124 S.Ct. 2711, 2723, 159 L.Ed.2d 513 (2004)); Bowie v. City of Columbia, 378 U.S. 347, 353-54, 362, 84 S.Ct. 1697, 1702, 1707, 12 L.Ed.2d 894 (1964) (stating that “[i]f a state legislature is barred by the Ex Post Facto Clause from passing ... a law, it must follow that a State Supreme Court is barred hy the Due Process Clause from achieving precisely the same result by judicial construction,” which was recognized as dicta in Rogers v. Tennessee, 532 U.S. 451, 458-59, 121 S.Ct. 1693, 1698, 149 L.Ed.2d 697 (2001)); and Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 16, 71 S.Ct. 534, 541, 95 L.Ed. 702 (1951) (stating that district court judgments can be upheld, despite an improper removal, where the district court would have had original jurisdiction at the time of trial or of the entry of judgment, which was recognized as “well-known dicta” in Caterpillar Inc. v. Lewis, 519 U.S. 61, 71-72, 117 S.Ct. 467, 474, 136 L.Ed.2d 437 (1996)).
All of these examples show that it is too late in the judicial day for any suggestion that the use of dicta amounts to the issuance of an advisory opinion in violation of Article Ill’s case or controversy requirement. As one commentator has correctly noted: “Essentially, an advisory opinion consists of formal, binding advice from a court of law to other government officials or the general public in the absence of a live case or controversy pending before the court. This definition would not encompass other forms of judicial advice, including dicta, alternative holdings, and the like, which are admittedly in some sense preca-tory in nature.” Ronald J. Krotoszyhiski, Jr., Constitutional Flares: On Judges, Legislatures, and Dialogue, 83 Minn. L. Rev. 1, 8 n.27 (Nov.1998). The self-described dicta in my concurring opinion does not purport to be “binding advice.” It is merely the statement of my views at this time on an issue that was briefed and argued but is not being decided in this case. The opinion itself explicitly acknowledges that these views bind no. one, including me. Ante at 1284-85.
Stated somewhat differently, even if these views are seen as “advisory” in the colloquial sense, their expression does not violate Article III. See Evan Tsen Lee, Deconstitutionalizing Justiciability: The Example of Mootness, 105 Harv. L. Rev. 603, 648-49 (Jan.1992) (“It is clear that dicta- — whether or not courts deem it to constitute an ‘advisory- opinion’ — run afoul of no constitutional or jurisdictional barrier.”); id. at-649 (“[WJhether to engage in dicta is a matter for the considered discretion of a court, and calling it an ‘advisory opinion’ changes that not one whit.”). There are sound reasons why dicta is not binding, but there can also be good reasons for its occasional use. See McDonald’s Corp., 147 F.3d at 1314-15. Whether this is a proper occasion for the use of dicta is a prudential decision for the writing judge. - It is not a constitutional issue. ■

. Some of the other circuits, at least, recognize that reasonable suspicion is not required where the arrestee being detained is charged with a felony or a violent crime. See, e.g., Masters, 872 F.2d at 1255 (distinguishing Dufrin v. Spreen, 712 F.2d 1084 (6th Cir.1983), where the court upheld a strip search policy for a pretrial detainee charged with a felony without reasonable suspicion or probable cause, from this case where the § 1983 plaintiff was arrested on a warrant for failure to appear in court); Mary Beth G., 723 F.2d at 1272 (distinguishing the constitutionality of strip searches where there is no probable cause or reasonable suspicion for pretrial detainees held on "inherently dangerous” crimes from the unconstitutionality of strip searches of "minor offenders”).
Part of this Court's opinion in Wilson, by contrast, might be read to apply to those charged with felonies as well as those charged with only misdemeanors, see Wilson, 251 F.3d at 1342-43, although that probably would be dicta since the facts of the case did not present the issue as it applies to felony-charged detainees, see Watts v. BellSouth Telecomm., Inc., 316 F.3d 1203, 1207 (11th Cir.2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced.”); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir.2000) (per curiam) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the court in the case which produced that decision.” (citations and internal marks omitted))'.

. The Supreme Court described the MCC strip search as follows: "If the inmate is a male, he must lift his genitals and bend over to, spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected. The inmate is not touched by security personal [sic] at any time during the visual search procedure.” Id. at 558 n. 39, 99 S.Ct. at 1884 n. 39.

. None of the decisions in this area, including our own, seem to distinguish between strip searches in general and "visual body-cavity inspections” as the procedure was described in Bell. I don't either.

. A second reason for strip searches is that they allow officials to identify gang members, who often have tattoos or identifying marks on their bodies. Finding the gang members early puts the officials on notice that these people are serious security risks and should be separated from' the general population where they can cause harm. Otherwise, all the detention facility has to go on is the crime for which the individual is charged, which may not reflect the danger the person poses. Id. at 47-48.

. The facility involved in the Bell case was not some special sort of seething cauldron of criminality. The Supreme Court described the facility this way: “MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the most advanced and innovative features of modern design of detention facilities.” Bell, 441 U.S. at 525, 99 S.Ct. at 1866. In the three years MCC strip searched all inmates before the trial in Bell, there was only one instance of smuggled contraband. Id. at 559, 99 S.Ct. at 1885. Yet, the Supreme Court found that "serious security dangers” warranted the strip search policy at all federal detention facilities, including MCC. Id. at 559, 99 S.Ct. at 1884-85.